## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MEDICAL MUTUAL OF OHIO | ) | CASE NO. |
| 2060 East 9th St. | ) | |
| Cleveland, OH 44115, | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR INJUNCTIVE,** |
| | ) | **DECLARATORY AND MONETARY** |
| AXA ASSISTANCE USA, INC., | ) | **RELIEF** |
| 122 South Michigan Ave. | ) | |
| Suite 1100 | ) | |
| Chicago, IL 60603 | ) | |
| | ) | **JURY DEMAND ENDORSED HEREON** |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| 151 Farmington Avenue | ) | |
| Hartford, Connecticut   06156 | ) | |
| | ) | |
| Defendants. | | |

Plaintiff, Medical Mutual of Ohio ("MMO"), states as follows for its Complaint against

Defendants, AXA Assistance USA, Inc. ("AXA") and Aetna Life Insurance Company ("Aetna"):

### PARTIES, JURISDICTION, AND VENUE

1.     MMO is a mutual insurance company organized under Ohio law with its principal

place of business in Cleveland, Ohio.  MMO sells individual and group health insurance, Medicare

supplemental insurance, and other ancillary products.

2.     AXA is an Illinois corporation with its principal place of business in Chicago,

Illinois that provides network administration services for healthcare plans, as well as travel

assistance and travel insurance.  AXA is part of the international insurance company the AXA

Group, one of the largest companies in the world.

3.     Aetna is a Connecticut corporation with its principal place of business in Hartford, Connecticut.  Aetna is a managed care company and one of the largest health insurers in the United States. In late 2017, CVS Health completed a $70 billion acquisition of Aetna, creating one of the country's largest health care companies.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

5.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to MMO's claims occurred in this District.

**FACTUAL ALLEGATIONS**

*a. AXA's Proposal to MMO and Letter of Understanding.*

6.     MMO contracts to provide group and individual health insurance to employer health plans and individuals throughout Ohio, and also provides third-party administration and related healthcare services to self-insured employers pursuant to "administrative services only" ("ASO") contracts with self-insured groups.

7.     Aetna sells health insurance products and contracts with networks of health care providers throughout the United States.

8.     To offer competitive insurance products to its Ohio customers, MMO must provide its Members access to healthcare services from providers located in states other than Ohio.  For example, many MMO customers in Ohio have employee Members who live just within, or just outside, Ohio's borders.  These Ohio customers demand that MMO's network includes access to providers located in the states that border Ohio.  In addition, MMO's Ohio customers expect access

to providers located in other states for employee Members and their family members who live or travel outside Ohio.

9.     In July, 2017, AXA approached MMO to propose an arrangement whereby in exchange for a fee, AXA would provide access to a national carrier's network to provide significant savings on claims.  Aetna's network was one of the options AXA presented.  AXA presented an analysis of Medical Mutual's claims demonstrating that Aetna's network provided the highest level of savings among the options.  AXA represented that under the arrangement, it would provide claims management and other related administrative services to certain of MMO's Covered Persons, and would arrange with Aetna for MMO to be granted access to Aetna's provider network at the same favorable provider contract terms Aetna customers receive for claims incurred outside Ohio.

10.     During its discussions with AXA, MMO repeatedly made clear to AXA that access to the Aetna network utilized by the majority of Aetna's customers, on the same favorable terms received by Aetna's own customers, was essential to MMO's willingness to enter into an agreement with AXA.   This access was critical to fulfill MMO's customers' demand for a broad network and favorable pricing for services outside of Ohio.

11.     To induce MMO to enter a contract with AXA, AXA specifically represented to MMO that Aetna was aware of its negotiations with MMO, and that Aetna would agree to grant MMO access to the Aetna network on the same favorable discount terms Aetna negotiated with providers for the claims of its own covered persons.

12.     As a further inducement to MMO to enter into the contract, in or about December, 2017, AXA and Aetna performed a "repricing exercise" to demonstrate to MMO the savings MMO would experience when it accessed the favorable reimbursement rates that Aetna had negotiated

3

for Aetna's network.  MMO supplied AXA and Aetna with approximately six months' of MMO claims data – over 190,000 claims -- for claims MMO had paid to providers who would be included in the proposed contract.  Aetna then re-priced those historic claims using Aetna's favorable discounts to demonstrate to MMO the savings MMO would experience when using Aetna's favorable pricing.  MMO relied on the discounts and savings Aetna and AXA represented, and Aetna's and AXA's representations in the repricing exercise were key to persuading MMO to enter the contract with AXA and Aetna.

13.     During negotiations among the parties, Aetna reiterated its commitment to provide MMO with Aetna's discounted reimbursement rates.  In early 2018, MMO requested an assurance that the MMO-Aetna arrangement would continue even if the Aetna-AXA relationship was altered.  As Aetna intended, in or about February, 2018, AXA conveyed to MMO Aetna's promise to that effect.

14.     On or about March 30, 2018, AXA and MMO executed a Letter of Understanding (the "LOU"), whereby the parties outlined their understanding regarding the services AXA would provide, and the access to Aetna's network MMO would receive.  A true copy of the LOU is attached hereto as Exhibit 1.  The initial term of the parties' agreement was to be seven years. LOU, ¶ 1.1.  Paragraph 9 of the LOU provided, "Execution of this LOU is conditioned upon AXA obtaining a commitment from Aetna, to [MMO's] satisfaction, agreeing to the contract initial term of the Agreement."

15.     Appendix A to the LOU, the "Description of Services," defined what "Network" would be accessible for MMO's Members:

>   Network. The term "Network" means a network of participating Providers who, as independent contractors have entered into contractual arrangements to provide Covered Services to Covered Persons in a Plan and to accept fees for those services at contracted rates.  The parties agree that Aetna's Open

> Choice PPO Network shall be the primary Network for these Services, and all future networks accessed by [MMO] even if name of the network is changed shall be the core Aetna network expressly utilized as the PPO network for the majority of all commercial Self Funded customers of Aetna's and the network covering most of commercial insured business of Aetna [*sic*]. *As of today and as a point of reference the reimbursement rates in Aetna's Open Choice PPO Network is the core network* [*sic*] *utilized for approximately 89% of Aetna's membership.*

LOU, Appx. A, at p. 4 (emphasis added).  The LOU further specified, in a paragraph titled "Network Enrollment," that "AXA shall enroll [MMO] into the Network."  LOU, Appx. A, ¶ 2, at p. 5.

16.    The LOU also specifically incorporated the parties' understanding that MMO's claims resulting from its Members' use of Aetna's Network would be paid in accordance with the terms of Aetna's contracts with providers: "AXA shall work with the Network to pay Providers for Covered Services in accordance with Network's agreements with its Providers."  LOU, Appx. A, ¶ 3 at p. 5.

### b.  The Master Claims Service and Management Agreement Between MMO and AXA.

17.    On or about June 5, 2018, MMO and AXA signed a Master Claims Service and Management Agreement (the "MMO-AXA Agreement"), a true copy of which is attached as Exhibit 2.   In the MMO-AXA Agreement, AXA agreed to serve as claims manager for MMO "Claims" incurred using the "Network."

18.    The MMO-AXA Agreement incorporated an attached "Claims Appointment Addendum" (the "Addendum").  AXA represented in the Addendum, "Claims Manager has a Network for [MMO's] Covered Persons to utilize as a participant," . . . and further promised, "Claims Manager shall enroll [MMO] into its Network . . . ." Addendum ¶¶ 4.2, 4.2(a).  Matching the language of the earlier LOU, the Addendum defined the applicable "Network" as Aetna's PPO

Open Choice Network.  Addendum, ¶ 1.7.  To ensure that there was no confusion as to the rates to be applied to MMO claims, the parties again further specified that MMO would be entitled to access "the core Aetna network expressly utilized as the PPO network for the majority of all commercial Self-Funded customers of Aetna's and the network covering most of commercial insured business [*sic*] of Aetna.  Addendum, ¶ 1.7.  As had the Letter of Intent, the Addendum continued, "As of March 30, 2018, and as a point of reference, *the reimbursement rates in Aetna's Open Choice PPO Network* is the core network [*sic*] utilized for approximately 89% of Aetna's membership."  *Id.*

19.     The initial term of the MMO-AXA Agreement, specified in the Addendum, would expire on December 31, 2025.  Addendum, ¶ 2.2.

20.     In exchange for AXA's promises and access to the Network and Aetna's negotiated rates, MMO agreed to pay AXA various fees, including "Savings Fees" to be calculated based on discounts MMO obtained when using the Network.  Addendum ¶ 6.3.   MMO also agreed that, with the exception of a limited set of providers the parties specified, MMO and its Covered Persons were obligated to use the Network for all services outside of Ohio, to ensure that AXA received Savings Fees for the services.  Addendum, Appx. B.

21.     AXA promised MMO that Aetna had already agreed to grant MMO access to Aetna's Open Choice Network and rates on the same terms as those applicable to Aetna's customers, and further that AXA would finalize and execute an agreement with Aetna that would mirror the MMO-AXA Agreement and formally document that obligation.  In reliance on that representation, MMO entered the MMO-AXA Agreement, and further understood that during claims processing, AXA would pay to Aetna a portion of the MMO fees in exchange for the Network and rates access.

6

### c. The Master Services Agreement between AXA and Aetna.

22.     Upon information and belief, AXA and Aetna entered into a corresponding Master Services Agreement dated on or about June 11, 2018 (the "AXA-Aetna MSA").  Pursuant to the AXA-Aetna MSA, Aetna agreed to allow MMO access to Aetna's Network and negotiated rates on terms as favorable as Aetna receives for its own covered persons when using the Network, and AXA and Aetna agreed how MMO's fees would be subdivided between them.

23.     MMO was an intended third-party beneficiary of the AXA-Aetna MSA, because Aetna's promise to allow MMO to access Aetna's Open Choice Network (including its discounted rates) on non-discriminatory terms is necessary to effectuate the intention of the parties; the circumstances indicate that both AXA and Aetna intended to benefit MMO by providing access to Aetna's Network at the same discounted rates as those received by Aetna; and Aetna's performance under the AXA-Aetna MSA would satisfy AXA's duty to MMO to provide MMO access to the Network in exchange for MMO's payment of fees.

24.     MMO requested that AXA allow MMO to view the final AXA-Aetna MSA, but AXA informed MMO that it could not share with MMO the AXA-Aetna MSA due to confidentiality obligations.  Instead, AXA has represented to MMO on multiple occasions since June, 2018, that the MSA obligates Aetna to provide MMO insureds access to Aetna's Open Choice Network on terms no less favorable than the discount rates given to Aetna's own customers.

25.     Over many years, MMO had developed contractual relationships with providers in counties bordering Ohio, and negotiated discounted reimbursement rates with various providers, including, e.g., the University of Pittsburgh Medical Center ("UPMC").  In connection with entering into the contractual arrangements with AXA and Aetna, AXA and Aetna informed MMO that, with the exception of a small group of specified providers, maintaining such separate provider

agreements would violate MMO's obligations to utilize Aetna's Network exclusively for claims with the providers at issue.  Accordingly, relying on the AXA and Aetna promise of access to the Open Choice Network and its promised favorable discounts that exceeded those MMO already had in place with providers in the border counties, MMO terminated its own direct contractual relationships with those providers, including UPMC.

26.     Since 2018, MMO has relied upon the access to the Open Choice Network granted by the MMO-AXA-Aetna contracts in marketing to and contracting with MMO's Ohio customers, and promised its Ohio customers, including self-insured "ASO" customers, that their Members would have access to the providers *and* favorable rates of Aetna's most popular network.

27.     Since 2018, MMO has fulfilled its obligations to AXA and Aetna pursuant to the parties' agreements.  Among other things, MMO has utilized AXA for claims management services and has paid to AXA service fees totaling more than $88 million. Upon information and belief, AXA has shared a portion of MMO's fees with Aetna.

### d.   *Aetna Attempts to Terminate and/or Change the Terms of the Agreements.*

28.     Almost immediately after the parties executed the MMO-AXA Agreement and the AXA-Aetna MSA (collectively, the "Agreements"), apparently regretting the deal to which it had bound itself, Aetna engaged in a series of actions to undermine the Agreements with MMO and AXA by attempting to change the terms of the Agreements or cause their termination.

29.     First, Aetna baselessly accused MMO of breaching the Agreements. In July, 2018, shortly after the Master Services Agreement was signed, MMO received a letter from Aetna stating that it had notified AXA that MMO had communicated to the market about the network arrangement with Aetna in violation of the parties' contracts.

30.     Aetna knew that MMO had not breached the Agreements and that Aetna's complaint about MMO's communications with brokers in the market was merely a pretext intended to create for Aetna an exit strategy to terminate the Agreements and to interfere with MMO's agreement with AXA.

31.     During meetings between MMO, AXA and Aetna in the summer and fall of 2018, representatives of Aetna admitted to MMO representatives that in truth, Aetna did not want the parties' Agreements to remain in place.  Aetna representatives insisted that the Agreements were "untenable" and "cannot go forward."  MMO representatives responded that Aetna had agreed to the contracts, and they would go forward.

32.     Over several months of discussions and meetings during 2018 Aetna attempted repeatedly to persuade MMO to abandon the Agreements and/or to convince MMO to accept a different network on different terms.  MMO insisted that Aetna and AXA perform according to the Agreements that were freely and knowingly executed by all parties.

33.     In January, 2019, Aetna had discussions with MMO as to whether MMO would limit its use of the Network. During a meeting at Aetna's headquarters in Hartford, the parties agreed to an amendment of the parties' Agreements pursuant to which MMO would limit its use of the Aetna Network with certain customers in return for lower fees.

34.     Over the next 12 months, the parties exchanged drafts of a contract amendment memorializing the agreement made in Hartford.  However, Aetna, without explanation, attempted to insert in amendment drafts changes to the contractual definition of "Network" that were totally unrelated to the amendment agreed upon in Hartford.  Aetna proposed to MMO and AXA a series of amendments to the language in Section 1.7 of the Addendum to the Agreements, with each proposed amendment designed to remove the reference to Aetna's reimbursement rates and

provide options for Aetna to utilize a different network for the MMO business, to MMO's disadvantage.  MMO refused to agree to the proposed amendments to the definition of "Network."

35.    A written amendment embodying the parties' agreement in Hartford was never executed.  Despite MMO abiding in good faith with the limited restrictions on the use of the Network the parties had agreed to in their negotiations, AXA and Aetna did not charge MMO the lower fees for which it bargained.  The excess fees which AXA and Aetna charged MMO amount to nearly $2 million for 2019 and likely much greater amounts annually for 2020 and future years.

### e.    Aetna Discriminates By Carving MMO Claims Out From Provider Agreements

36.    Having been unsuccessful in its efforts to terminate or amend the Agreements, Aetna proceeded nevertheless to deny MMO access to Aetna's negotiated discounts in other ways.

37.    In or about February, 2020, AXA informed MMO that with respect to at least one provider in Aetna's Network – UPMC -- Aetna was discriminating against MMO claims by not honoring the Open Choice Network discounts granted to Aetna by UPMC with respect to MMO claims.  Specifically, instead of discounts of approximately 65% applicable to Aetna's claims from UPMC, AXA and Aetna processed MMO claims from UPMC by applying discounts of approximately 35%.  These 35% discounts are less favorable even than the discounts MMO received under its previously-existing provider contract with UPMC which MMO was required to terminate in connection with the MMO-AXA Agreement and for which MMO was not required to pay an access fee to a third party.

38.    Upon information and belief, in breach of its obligations to MMO as a third-party beneficiary of the AXA-Aetna MSA, Aetna secretly negotiated language in its Open Choice Network agreement with UPMC carving out MMO claims from favorable discount provisions

applicable to Aetna claims, and specifying less favorable treatment for MMO claims, in violation of Aetna's contracted duties to MMO.

39.     While MMO is not certain of its exact damages because Aetna refuses to provide a complete account of claims subject to the improper carve-out for each year, MMO estimates that the discriminatory treatment of MMO claims has caused MMO to pay overcharges to UPMC and other providers amounting to over $18,000,000 for 2019 alone.  Moreover, the discriminatory treatment of MMO claims has led to higher claim payments paid by MMO's self-insured customers, and higher out-of-pocket charges such as deductibles and cost-sharing for certain MMO Members, which has damaged MMO's relationship with its customers.

40.     When it discovered the improper carve-out, MMO demanded that AXA and Aetna examine all claims paid to UPMC to recalculate the claims and pay back to MMO and its customers the overcharges.  To date, Aetna has not returned the overpayments to MMO. Additionally, the overpayments have continued through the present.

41.     MMO has reason to believe Aetna has entered into similar provisions "carving out" MMO claims from Aetna's Open Choice Network provider agreements, and promising providers other than UPMC that claims generated by MMO Members would be subject to a lesser discount than claims generated by Aetna covered persons.  The carve-outs to UPMC and other providers are estimated to have resulted in an additional approximately $10 million or more of lost discounts to MMO per year continuing into 2022.

> **f.     MMO Notifies AXA of Intent to Terminate the MMO-AXA Agreement
> Due to AXA and Aetna's Breaches**

42.     On many occasions during 2019 and 2020, in multiple emails and oral discussions, MMO and AXA discussed the failure of Aetna to provide MMO access to Providers at the contracted rates of Aetna's Open Choice PPO Network.  MMO notified AXA that Aetna's refusal

to provide MMO that access at non-discriminatory rates denied MMO access to the "Network," and thus was a material breach of the MMO-AXA Agreement, including Article X, Representations and Warranties, § 10.5, and the Claims Appointment Addendum, § 4.2.  MMO also expressed that the breach would violate what AXA represented to MMO was guaranteed by its own Agreement with Aetna. AXA agreed with that conclusion.

43.     MMO proposed various routes for remedying the breach, however, those options were not accepted by Aetna, and the default has not been cured.  Indeed, after negotiations with AXA, Aetna, through its correspondence from Regional Manager (Americas) Mike Delamare to Blessy George of AXA Assistance dated April 29, 2021, unequivocally informed MMO that Aetna will *never* guarantee MMO comparable discounts to those Aetna receives with respect to all Providers.  As Mr. Delamare articulated Aetna's position in that correspondence:

> "As we have stated consistently, our provision of network access to MMO and the attendant services we provide does not, and cannot, guarantee that any individual provider will give MMO its best rates. . . . Similarly, we cannot and will not guarantee that any provider will keep MMO at the same rates as Aetna members now or in the future, nor can we or will we give you or MMO any veto rights over any changes with any of our provider contracts."

Notwithstanding MMO's notices of this default, AXA has failed to cure the default and ensure MMO's access to the Network on non-discriminatory terms that are equal to those terms received by Aetna with the same providers.

44.     Article XII, Term & Termination, § 12.2 of the MMO-AXA Agreement provides in relevant part that "[t]his Agreement or any Appointment Addendum, individually or in the aggregate, may be terminated by [MMO] or [AXA] as follows:

> (a)  Upon ninety (90) days prior written notice to the other party in the event of a default under this Agreement by the other party whereby the defaulting either party [*sic*] failed to take reasonable steps to remedy such default within (sixty) 60 days of notice of such default.

Exhibit 2, Art. XII, § 12.2.  The Agreement defines "default" to include: "any material breach of a term of this Agreement which is not cured by the breaching party within forty-five (45) days after receipt of notice of such a breach from the other party unless the notice specifies otherwise and the breaching party has failed to take reasonable steps to remedy such default within sixty (60) days of notice of such default."  Exh. 2, Art. XII, § 12.5.1

45. On June 28, 2022, MMO forwarded the Notice of Termination (the "Notice") attached hereto as Exhibit 3 to AXA.  MMO's Notice identified as a default the ongoing material breach of the parties' Agreement by AXA which it had notified AXA of repeatedly as early as 2020 – namely, the failure of AXA and Aetna to ensure MMO's access to the Network via non-discriminatory rates – and further noted that AXA had failed to cure the default in the more than two years since AXA had first been notified of it.  The Notice indicated that MMO will terminate the MMO-AXA Agreement effective December 31, 2022 (more than 180 days after the Notice).

46. To date, AXA has failed to cure the default identified in MMO's Notice, notwithstanding having more than two years to attempt to cure Aetna's failure to guarantee to MMO the discounts Aetna itself receives from Providers in Aetna's Open Choice PPO Network. In fact, Aetna's own statements indicate the default will never be cured.

47. When MMO informed AXA of its intention to terminate the MMO-AXA Agreement, and seek claims management services from another provider on and after January 1, 2023, an AXA representative made statements intimating AXA would claim that MMO was breaching exclusivity obligations in the MMO-AXA Agreement.  Moreover, AXA sent correspondence on June 27, 2022, to a third party provider of claims management services with whom MMO has had discussions, Cigna Payer Solutions, falsely alleging that MMO changing providers of such services in 2023 would breach the MMO-AXA Agreement.

## COUNT I
### Breach of Contract, Against AXA and Aetna

48.     MMO incorporates by reference the allegations contained in paragraphs 1 through 47 of this Complaint as if fully rewritten here.

49.     The MMO-AXA Agreement, and the AXA-Aetna MSA, are both valid and enforceable contracts under which MMO was promised access to Aetna's Network and negotiated reimbursement rates on terms as favorable as those granted to Aetna's own customers.

50.     MMO is an intended third-party beneficiary of the AXA-Aetna MSA, and specifically Aetna's promise to grant MMO non-discriminatory access to the Aetna Network and the favorable pricing received for Aetna's own customers' claims.

51.     MMO fully performed its obligations under the MMO-AXA Agreement, and the AXA-Aetna MSA.

52.     AXA and Aetna have materially breached the MMO-AXA Agreement and the AXA-Aetna MSA by failing to ensure that MMO's claims were processed on the same terms as those applied to Aetna's own customers' claims.

53.     AXA and Aetna's material breaches caused or will cause MMO substantial monetary damages in an amount to be proven at trial, but which in any event exceed $75,000.

54.     Furthermore, as a direct and proximate result of AXA and Aetna's refusal to abide by the provisions of the MMO-AXA Agreement and the MSA, MMO is threatened with permanent and irreparable injury to its business, including its relationship and reputation with its customers, and other damages not readily calculable.  MMO reasonably apprehends that its relationships with its customers will be permanently damaged if immediate relief is not granted obligating AXA and Aetna to ensure that all MMO claims are processed pursuant to the same favorable discounts from providers in the Open Choice Network as Aetna applies to claims of its own covered persons.

## COUNT II
### Tortious Interference with MMO's Contract with AXA, Against Aetna

55.     MMO incorporates by reference the allegations contained in paragraphs 1 through 54 of this Complaint as if fully rewritten here.

56.     The MMO-AXA Agreement was a valid, enforceable contract between MMO and AXA.

57.     Aetna had knowledge of the MMO-AXA Agreement and of the terms of that Agreement.

58.     By engaging in the conduct described above, including by (a) falsely claiming MMO was in breach of the MMO-AXA Agreement; (b) attempting to change the definition of "Network" in the MMO-AXA Agreement when discussing an unrelated amendment to the parties' Agreements; and (c) by processing claims for MMO Members using discriminatory lower discounts than the discounts provided to other Aetna customers utilizing Aetna's Network, Aetna intentionally interfered with the MMO-AXA Agreement between MMO and AXA, causing AXA to breach the Agreement and its duties to MMO to provide non-discriminatory access to Aetna's Network including its reimbursement rates.

59.     Aetna lacked privilege or justification for its interference with the contract between MMO and AXA.

60.     AXA breached the contract with MMO as a direct and proximate result of Aetna's interference, causing MMO harm.

61.     Aetna's intentional interference in MMO's contract with AXA caused or will cause MMO substantial monetary damages in an amount to be proven at trial, but which in any event exceed $75,000.

62.     Furthermore, as a direct and proximate result of Aetna's intentional interference in the MMO-AXA Agreement, MMO is threatened with permanent and irreparable injury to its business, including its relationship and reputation with employer customers and members, and other damages not readily calculable.  MMO reasonably apprehends that its relationships with its customers will be permanently damaged if immediate relief is not granted obligating Aetna to cease its interference with the MMO-AXA Agreement, and ensure that all MMO claims are processed pursuant to the same favorable discounts from providers in the Open Choice Network as Aetna applies to claims of its own covered persons.

**COUNT III**
**Tortious Interference with MMO's Business Relationships with**
**its Self-Insured Customers, Against Aetna**

63.     MMO incorporates by reference the allegations contained in paragraphs 1 through 62 of this Complaint as if fully rewritten here.

64.     MMO has ongoing business relationships with its self-insured customers, also known as "ASO group customers."

65.     Aetna had knowledge of MMO's business relationships with ASO group customers, and was aware that, as an inducement to gain the business of several ASO group customers, MMO had specifically represented to the ASO groups that by contracting with MMO, they would receive the discounts Aetna had negotiated for Aetna's core Network for the claims outside of Ohio.

66.     By engaging in the conduct described above, including by processing claims for MMO Members using discriminatory lower discounts than the discounts provided to other Aetna customers utilizing Aetna's Network, Aetna intentionally interfered with MMO's business

relationships with its ASO group customers by causing MMO to fail to meet its promises to customers as to the rates applicable to their claims.

67.     Aetna lacked privilege or justification for its interference in the business relationships of MMO with its ASO group customers.

68.     As a proximate result of Aetna's interference, MMO has been damaged by the loss of certain business relationships between MMO and ASO group customers.

69.     Aetna's intentional interference in MMO's business relationships caused or will cause MMO substantial monetary damages in an amount to be proven at trial, but which in any event exceed $75,000.

70.     Furthermore, as a direct and proximate result of Aetna's intentional interference in MMO's business relationships, MMO is threatened with permanent and irreparable injury to its business, including its relationship and reputation with employer customers and members, and other damages not readily calculable. MMO reasonably apprehends that its relationships with its customers will be permanently damaged if immediate relief is not granted obligating Aetna to cease its interference with MMO's business relationships and ensure that all MMO claims are processed pursuant to the same favorable discounts from providers in the Open Choice Network as Aetna applies to claims of its own covered persons.

### COUNT IV
### Unjust Enrichment, Against AXA and Aetna

71.     MMO incorporates by reference the allegations contained in paragraphs 1 through 70 of this Complaint as if fully rewritten here.

72.     MMO conferred a benefit upon AXA and Aetna by fully performing its obligations and paying access fees to AXA and Aetna.

73.     AXA and Aetna have knowledge of the benefit conferred by MMO and have shared in that benefit.

74.     By engaging in the conduct set forth in this Complaint, AXA and Aetna continue to retain the benefit conferred by MMO.

75.     Defendants' retention of the benefit conferred by MMO is unjust under the circumstances.

76.     As a direct and proximate result of Defendants' unjust enrichment, MMO is entitled to substantial monetary damages in an amount to be proven at trial, but which in any event exceed $75,000.

**COUNT V**
**Promissory Estoppel, Against AXA and Aetna**

77.     MMO incorporates by reference the allegations contained in paragraphs 1 through 76 of this Complaint as if fully rewritten here.

78.     AXA and Aetna made a clear and unambiguous promise to MMO that Aetna would grant MMO access to Aetna's Open Choice Network, on discount terms as favorable as Aetna receives for its own customers.

79.     By engaging in the conduct set forth in this Complaint, AXA and Aetna breached that promise.

80.     MMO relied on AXA's and Aetna's promise that Aetna had agreed to grant MMO access to Aetna's Open Choice Network on terms as favorable as those granted to Aetna's own customers, terminated other contracts MMO had with providers, and made representations to its own customers regarding the discounts they would receive.

81.     MMO's reliance on AXA's and Aetna's promise was reasonable and foreseeable.

82.     As a direct and proximate result of AXA's and Aetna's breach of their promises, MMO is entitled to an award of damages in an amount to be further established by the evidence, but which is in excess of $75,000.

83.     Furthermore, as a direct and proximate result of AXA and Aetna's breach of their promises described above, MMO is threatened with permanent and irreparable injury to its business, including its relationship and reputation with employer customers and members, and other damages not readily calculable.  MMO reasonably apprehends that its relationships with its customers will be permanently damaged if immediate relief is not granted obligating AXA and Aetna to keep their promises to grant MMO access to Aetna's Open Choice Network including access to the same favorable discounts from providers as Aetna applies to claims of its own covered persons.

## COUNT VI
### Declaratory Judgment, Against AXA

84.     MMO incorporates by reference the allegations contained in paragraphs 1 through 83 of this Complaint as if fully rewritten here.

85.     On June 28, 2022, MMO provided written Notice to AXA pursuant to Article XII, §12.2 of the MMO-AXA Agreement that MMO would terminate that MMO-AXA Agreement effective December 31, 2022 (more than 180 days later) due to an event of default by AXA.

86.     There is a substantial and continuing justiciable controversy between MMO and AXA as to whether AXA has committed an event of default under the MMO-AXA Agreement.

87.     Similarly, there is a substantial and continuing justiciable controversy between MMO and AXA as to whether MMO has effectively provided a Notice of Termination to AXA pursuant to Article XII, § 12.2 of the Agreement.

88.     There is also a substantial and continuing justiciable controversy between MMO and AXA as to whether the MMO-AXA Agreement shall be terminated effective December 31, 2022, relieving the parties as of that date of any exclusivity obligations set forth in the MMO-AXA Agreement.

89.     MMO seeks a declaratory judgment that the breach of the MMO-AXA Agreement by AXA constitutes an event of default under the MMO-AXA Agreement, entitling MMO to terminate the agreement under Article XII, § 12.2.

90.     MMO seeks a declaratory judgment that MMO has provided an effective Notice of Termination of the AXA Agreement on or about June 28, 2022, terminating the Agreement effective December 31, 2022.

91.     MMO seeks a declaratory judgment that upon the termination of the MMO-AXA Agreement as of December 31, 2022, MMO will not be bound by the exclusivity provisions in the Agreement, and will not violate the MMO-AXA Agreement by contracting with another party to provide services similar to those currently provided by AXA and/or Aetna as of January 1, 2023, or later.

92.     Such determination is proper and would terminate the controversy between the parties.

### PRAYER FOR RELIEF

WHEREFORE, MMO prays this Court for the following relief:

a) On all Counts, temporary and/or preliminary injunctive relief of specific performance as follows:

(1)     requiring AXA and Aetna to re-process all MMO claims associated with UPMC services which have been denied the favorable terms of Aetna's Open Choice PPO Network, applying the proper discount consistent with

the discounts granted to Aetna pursuant to the Open Choice PPO Network agreement;

(2)     requiring Aetna to notify any other providers with whom Aetna has discussed or contracted for discriminatory treatment of MMO to ensure those providers extend to MMO customers the benefit of the rates guaranteed for Aetna's Open Choice PPO Network, consistent with section 1.7 of the Claims Appointment Addendum.

(3)     requiring Aetna on a going-forward basis to grant MMO access to the same network chosen by the majority of Aetna's self-insured customers, regardless of whether it is the Open Choice PPO Network or another network created by Aetna, on the same favorable financial terms including all discounts as Aetna receives for its own customers;

b)  On Counts I, IV, and V, damages jointly and severally against AXA and Aetna in an amount to be determined at trial, but in any event at least $75,000;

c)  On Counts II and III, damages against Aetna in an amount to be determined at trial, but in any event at least $75,000;

d)  On Count VI, for a declaratory judgment as follows:

(1)     that the breach of the MMO-AXA Agreement by AXA constitutes an event of default under the MMO-AXA Agreement, entitling MMO to terminate the agreement under Article XII, § 12.2;

(2)     that that MMO has provided an effective Notice of Termination of the AXA Agreement on or about June 28, 2022, terminating the Agreement effective December 31, 2022;

(3)     that upon the termination of the MMO-AXA Agreement as of December 31, 2022, MMO will not be bound by the exclusivity provisions in the Agreement, and will not violate the MMO-AXA Agreement by contracting with another party to provide services similar to those currently provided by AXA and/or Aetna as of January 1, 2023, or later;

e)  On all Counts, the reasonable costs and attorneys' fees that MMO incurs here; and

f)  Such other or further relief that this Court deems just and proper.

Respectfully submitted,

/s/     *Maura L. Hughes*

CHRISTOPHER S. WILLIAMS (0043911)
MAURA L. HUGHES (0061929)
ANTHONY F. STRINGER (0071691)
BRANDON E. BROWN (0097013)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114-1607
(216) 622-8200 (Phone)
(216) 241-0816 (Fax)
CWilliams@Calfee.com
MHughes@Calfee.com
AStringer@Calfee.com
Bbrown@Calfee.com

*Attorneys for Plaintiff,*
*Medical Mutual of Ohio*

## JURY DEMAND

Plaintiff Medical Mutual of Ohio hereby demands trial by jury on all claims and issues so triable.

/s/   *Maura L. Hughes*
CHRISTOPHER S. WILLIAMS (0043911)
MAURA L. HUGHES (0061929)
ANTHONY F. STRINGER (0071691)
BRANDON E. BROWN (0097013)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114-1607
(216) 622-8200 (Phone)
(216) 241-0816 (Fax)
CWilliams@Calfee.com
MHughes@Calfee.com
AStringer@Calfee.com
Bbrown@Calfee.com


*Attorneys for Plaintiff,*
*Medical Mutual of Ohio*