**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MEDICAL MUTUAL OF OHIO, | ) | CASE NO. 1:22-cv-1313 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| AXA ASSISTANCE USA, INC., *et al*., | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Medical Mutual of Ohio ("MMO") filed a Complaint naming AXA Assistance
USA, Inc. ("AXA") and Aetna Life Insurance Company ("Aetna") as Defendants. (R. 1). The
Complaint raises six causes of action: (1) breach of contract against both Defendants; (2)
tortious interference with contract against Aetna; (3) tortious interference with business
relationships against Aetna; (4) unjust enrichment against both Defendants; (5) promissory
estoppel against both Defendants; and (6) declaratory judgment against AXA. *Id.*

Defendant AXA filed its answer, raising counterclaims against Plaintiff MMO and cross-
claim against Defendant Aetna. (R. 14). On the same day, Defendant Aetna filed a motion to
dismiss the Complaint for failure to state a claim. (R. 15). Defendant Aetna filed a motion to
dismiss AXA's cross-claim and requested oral argument. (R. 17). Defendant AXA filed a brief
opposing the dismissal of its cross-claim (R. 25), to which Aetna filed a reply. (R. 30).

In addition, Defendant AXA filed a motion to dismiss the Complaint for failure to state a

claim, alternatively a motion for judgment on the pleadings. (R. 18).

Plaintiff filed separate memoranda in opposition to Defendants' motions to dismiss. (R. 19 & 24). Defendants filed replies supporting their respective motions. (R. 23 & 29).

Having considered the pertinent filings, the Court finds the request for oral argument unnecessary.

## I. Factual Allegations[1]

### A. Discussions Preceding the Letter of Understanding

Plaintiff MMO provides group and individual health insurance to employer health plans as well as individuals throughout the State of Ohio, and also provides third-party administration and related healthcare services to self-insured employers. (R. 1, PageID# 2, ¶6). In order to offer competitive insurance products to its Ohio customers, MMO represents that it "must provide its Members access to healthcare services from providers located in states other than Ohio" because many MMO customers "live just within, or just outside, Ohio's borders" and "MMO's Ohio customers expect access to providers located in other states for employee Members and their family members who live or travel outside Ohio." (R. 1, PageID# 2-3, ¶8).

Defendant Aetna is a managed care company and one of the largest health insurers in the United States. (R. 1, PageID# 2, ¶3).

Defendant AXA provides network administration services for healthcare plans. (R. 1, PageID# 1, ¶2). In July of 2017, AXA allegedly proposed an arrangement to MMO whereby AXA, for a fee, would provide access to a national carrier's network resulting in significant

---

[1] When ruling upon a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all the factual allegations contained in the complaint and construe the complaint in the light most favorable to the plaintiff.

savings on claims. *Id*. at ¶9. "AXA presented an analysis of [MMO's] claims demonstrating that Aetna's network provided the highest level of savings among the options," and further represented that AXA "would provide claims management and other related administrative services to certain of MMO's Covered Persons, and would arrange with Aetna for MMO to be granted access to Aetna's provider network at the same favorable provider contract terms Aetna customers receive for claims incurred outside Ohio." *Id*. MMO emphasized to AXA that access to the Aetna network "on the same favorable terms received by Aetna's own customers, was essential to MMO's willingness to enter into an agreement with AXA." *Id*. at ¶10.

The Complaint alleges that AXA, in order to induce MMO to enter a contract, "specifically represented to MMO that Aetna was aware of its negotiations with MMO, and that Aetna would agree to grant MMO access to the Aetna network on the same favorable discount terms Aetna negotiated with providers for the claims of its own covered persons." *Id*. at ¶11. Around December 2017, Defendants AXA and Aetna engaged in a "repricing exercise" to illustrate the savings that would accrue to MMO "when it accessed the favorable reimbursement rates that Aetna had negotiated for Aetna's network." *Id*. at ¶12. "In early 2018, MMO requested an assurance that the MMO-Aetna arrangement would continue even if the Aetna-AXA relationship was altered." In February of 2018, AXA allegedly conveyed to MMO "Aetna's promise to that effect." *Id*. at ¶13.

**B. Letter of Understanding**

On or about March 30, 2018, AXA and MMO executed a Letter of Understanding ("LOU"), which outlined their understanding regarding the services AXA would provide,

3

including access to Aetna's network. (R. 1, PageID# 4, ¶14).[2]  Appendix A to the LOU contains

definitions of various terms to the LOU, including the definition of "Network" as follows:

> Network. The term "Network" means a network of participating Providers who,
> as independent contractors have entered into contractual arrangements to provide
> Covered Services to Covered Persons in a Plan and to accept fees for those
> services at contracted rates. The parties agree that Aetna's Open Choice PPO
> Network shall be the primary Network for these Services, and all future networks
> accessed by Client even if name of the network is changed shall be the core Aetna
> network expressly utilized as the PPO network for the majority of all commercial
> Self Funded customers of Aetna's and the network covering most of commercial
> insured business of Aetna. As of today and as a point of reference the
> reimbursement rates in Aetna's Open Choice PPO Network is the core network
> utilized for approximately 89% of Aetna's membership.

(R. 1-3, PageID# 35). The LOU further specified that "AXA shall enroll [MMO] into the

Network." *Id*. at PageID# 36.

**C.  Master Claims Service and Management Agreement ("MMO-AXA Agreement")**

     On June 5, 2018, MMO and AXA entered into a Master Claims Service and

Management Agreement (hereinafter the "MMO-AXA Agreement"), a copy of which is attached

to the Complaint as Exhibit 2. (R. 1, PageID# 5, ¶17). The Addendum to the MMO-AXA

contains nearly identical language to the LOU, reiterating that "[t]he parties agree that Aetna's

Open Choice PPO Network, including Aetna's National Advantage Program ("NAP"), shall be

the primary Network for these Services, and all future networks accessed by Client even if name

of the network is changed shall be the core Aetna network expressly utilized as the PPO network

for the majority of all commercial Self-Funded customers of Aetna's and the network covering

most of commercial insured business of Aetna…. [and] Aetna's Open Choice PPO Network is

the core network utilized for approximately 89% of Aetna's membership." (R. 1-4, PageID# 75,

---

[2] A copy of the LOU and attached appendices are attached to the Complaint as Exhibit 1. (R. 1-3, PageID# 32-47).

¶1.7). The contract goes on to explicitly state: "As of March 30, 2018, and as a point of reference *the reimbursement rates* in Aetna's Open Choice PPO Network is the core network utilized for approximately 89% of Aetna's membership." *Id.* (emphasis added). The initial term of the MMO-AXA Agreement, specified in the Appointment Addendum, would expire on December 31, 2025. (R. 1-4, PageID# 76, ¶ 2.2). The Claims Appointment Addendum § 4.4 further states that AXA will process claims "through its Network" and that "Claims Manager shall arrange to have Claims from Providers repriced" though MMO remained responsible for payment of Claims. (R. 1-4, PageID# 80).

MMO alleges that AXA promised "that Aetna had already agreed to grant MMO access to Aetna's Open Choice Network and rates on the same terms as those applicable to Aetna's customers," and that AXA would finalize and execute an agreement with Aetna to that effect. (R. 1, PageID# 6, ¶21). MMO represents that "[i]n reliance on that representation, MMO entered the MMO-AXA Agreement…." *Id.*

**D. Master Service Agreement Between AXA and Aetna**

The Complaint alleges that AXA and Aetna entered into a corresponding Master Services Agreement on June 11, 2018—six days after the MMO-AXA Agreement (the "AXA-Aetna MSA"). (R. 1, PageID# 7).[3] MMO alleges it was an intended third-party beneficiary of the AXA-Aetna MSA, because "circumstances indicate that both AXA and Aetna intended to benefit MMO by providing access to Aetna's Open Choice Network. (R. 1, PageID# 7, ¶23). The AXA-Aetna MSA contains the following provision:

> WHEREAS, AXA has entered into a Master Claims Services and Management Agreement (hereinafter referred as the "MSA") with Medical Mutual of Ohio, an

---

[3] Defendant Aetna has attached a copy of the AXA-Aetna MSA to it Motion to Dismiss as Exhibit A. (R. 15-1, PageID# 246-281).

Ohio company (hereinafter referred as "MMO"). The MSA causes AXA to become claims manager of certain MMO's claims.

WHEREAS, AXA desires to engage Aetna to provide certain services with respect to AXA's obligations in the MSA as the claims manager for MMO. Aetna accepts such engagement and shall provide certain healthcare related services under this Agreement.

(R. 15-1, PageID# 246). Echoing the above referenced LOU and MMO-AXA Agreement, AXA-Aetna MSA defines Network as follows:

**Network**, means the Aetna network of participating Aetna Providers who, as independent contractors have entered into contractual arrangements with Aetna to provide Covered Services to Covered Persons in a Plan and to accept fees for those services at contracted rates. The parties agree that Aetna's Open Choice PPO Network, including Aetna's National Advantage Program ("NAP"), as well as any future network accessed by MMO, even if the name of the network has changed, that is expressly utilized as the PPO network for the majority of all commercial or self-funded customers of Aetna's, shall by the primary Network for these services. As of March 30, 2018, and as a point of reference, Aetna's Open Choice PPO Network is the core network utilized for approximately 89% of Aetna's membership.

(R. 15-1, PageID# 247, ¶1.7). The agreement, by its terms, was slated to expire on December 31, 2025. *Id*. at ¶2.2. Plaintiff avers that by this agreement, "both AXA and Aetna intended to benefit MMO by providing access to Aetna's Network at the same discounted rates as those received by Aetna." (R. 1, PageID# 7, ¶23). Article IV, § 4.3 of this agreement, which discusses the responsibilities of the parties, states that: "For Covered Persons who elect to receive Covered Services from an Aetna Provider … Aetna will receive the Claim for such service from the Aetna Provider or from MMO, *reprice through its Network*, and send AXA a report of such services through a mutually acceptable electronic data interchange …. " (R. 15-1, PageID# 249) (emphasis added). Article IV, § 4.4 of the same agreement expressly states that: "For those medical services that an Aetna Provider provides to a Covered Person pursuant to a Plan and that AXA indicates are Covered Services, *Aetna will apply its negotiated rates* and pay that Aetna

6

Provider for the related Claim in accordance with this Agreement."   (R. 15-1, PageID# 249) (emphasis added).

MMO asserts that its "has fulfilled its obligations to AXA and Aetna pursuant to the parties' agreements. Among other things, MMO has utilized AXA for claims management services and has paid to AXA service fees totaling more than $88 million. Upon information and belief, AXA has shared a portion of MMO's fees with Aetna." (R. 1, PageID# 8, ¶27).

**E. Events Subsequent to the Agreements**

It is alleged Aetna, attempting to change the terms of both Agreements or cause their termination, "baselessly accused MMO of breaching the Agreements" by communicating to the market about its network arrangement with Aetna in violation of the parties' contracts. (R. 1, PageID# 8, ¶¶28-29). During meetings between MMO, AXA and Aetna in the summer and fall of 2018, representatives of Aetna allegedly admitted to MMO representatives that Aetna simply did not want the parties' Agreements to remain in place, describing them as "untenable" and that they "cannot go forward." (R. 1, PageID# 9, ¶31). Over the next several months, Aetna attempted repeatedly to persuade MMO to abandon the Agreements and/or to accept a different network on different terms. *Id*. at ¶32.

In January of 2019, Aetna had discussions with MMO where the parties agreed to an amendment of their Agreements pursuant to which MMO would limit its use of the Aetna Network with respect to certain customers in exchange for lower fees, but a written agreement was never executed after multiple drafts by Aetna attempted to amend the language in Section 1.7 of the Addendum to the Agreements to redefine the "Network". *Id*. at ¶¶34-35. MMO asserts that it, nonetheless, complied with the agreed upon terms of the amendment, but did not receive the lower fees for which it bargained, resulting in nearly $2 million in excess charges in 2019

alone. *Id*. at ¶35.

In February of 2020, AXA informed MMO that, with respect to at least one provider (UPMC), Aetna would not honor the 65 percent Open Choice Network discount granted to Aetna by UPMC and instead apply only 35 percent discounts. (R. 1, PageID# 10, ¶37). MMO estimates that the alleged discriminatory treatment by Aetna of its claims has caused it to pay overcharges to UPMC and other providers amounting to over $18 million for 2019 alone. *Id*. at ¶38. Furthermore, Aetna's alleged discriminatory treatment of MMO's claims has resulted in higher claim payments paid by MMO's self-insured customers, including higher out-of-pocket charges. *Id*. at 39. This has damages MMO's relationship with its customers. *Id*.

On numerous occasions in 2019 and 2020, MMO and AXA discussed the failure of Aetna to provide MMO access to providers at the contracted rates of Aetna's Open Choice PPO Network. (R. 1, PageID# 11-12, ¶42). MMO notified AXA that Aetna's refusal to provide MMO network access at the agreed upon rates was a material breach of the MMO-AXA Agreement. *Id*. AXA has failed to cure the breach and ensure MMO's access to the Network on non-discriminatory terms. *Id*. at ¶43.

Article XII, § 12.2 of the MMO-AXA Agreement states: "This Agreement or any Appointment Addendum, individually or in the aggregate, may be terminated by the Company or the Claims Manager as follows: (a) Upon ninety (90) days prior written notice to the other party in the event of a default under this Agreement by the other party whereby the defaulting either [sic] party failed to take reasonable steps to remedy such default within (sixty) 60 days of notice of such default." (R. 1-4, PageID# 55, ¶12.2). The MMO-AXA Agreement defines "default" to include: "any material breach of a term of this Agreement which is not cured by the breaching party within forty-five (45) days after receipt of notice of such a breach from the other party

8

unless the notice specifies otherwise and the breaching party has failed to take reasonable steps to remedy such default within sixty (60) days of notice of such default." *Id*. at ¶12.5.1.

After receiving a Notice of Termination from MMO, AXA sent correspondence on June 27, 2022, to a third party provider of claims management services, with whom MMO had discussions (Cigna Payer Solutions), alleging that MMO changing providers of such services in 2023 would breach the MMO-AXA Agreement. (R. 1, PageID# 13, ¶¶45-47).

## II. Standard of Review

When ruling upon a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all the factual allegations contained in the complaint and construe the complaint in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007); *accord Streater v. Cox*, 336 F. App'x 470, 474 (6th Cir. 2009). Nonetheless, a court need not accept a conclusion of law as true:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v.*] *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed. 2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955, 167 L.Ed. 2d 929 (*citing Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed. 2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S. Ct. 1955, 167 L.Ed. 2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955, 167 L.Ed. 2d 929.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955, 167 L.Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955, 167 L.Ed. 2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are

"merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557, 127 S. Ct. 1955, 167 L.Ed. 2d 929 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

## III. Analysis

### A. Count One: Breach of Contract against Defendants Aetna and AXA[4]

Defendant Aetna's motion to dismiss argues that MMO's claim for breach of contract in Count One fails as a matter of law, because the contract does not impose the obligation allegedly breached. (R. 15, PageID# 231-234). Aetna points out that it is not a signatory to the MMO-AXA Agreement and cannot have breached that contract. *Id.* at PageID# 231.[5] Further, Aetna contends that the AXA-Aetna MSA does not require it to provide MMO with the same favorable discount rates it provides to its covered persons, and does not prohibit Aetna from negotiating with network providers contracted rates for services provided to MMO's insureds that are different than the rates for services provided to Aetna's own insureds. *Id.*

Aetna concedes that "[t]here is no dispute that under the AXA-Aetna MSA, Aetna agreed to give—and did give—MMO's insureds access to health services by providers in Aetna's Open Choice PPO Network." (R. 15, PageID# 231). Nevertheless, Aetna argues that "there is no other provision in the AXA-Aetna MSA that requires the 'contracted

---

[4] There appears to be no dispute that Ohio law applies, as both the MMO-AXA Agreement and the AXA-Aetna MSA have clauses stating "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Ohio[.]" (R. 1-4, § 16.3, PageID# 59; R. 15-1, Exh. A., § 19.3, PageID# 264).

[5] Later in its motion, Defendant Aetna acknowledges that MMO is a third-party beneficiary to the AXA-Aetna MSA. (R. 15, PageID# 240-241).

rates' be 'on the same terms as,' 'as favorable as,' 'non-discriminatory [as compared to],' or 'no less favorable than' the rates charged to Aetna's own insureds, as MMO's complaint alleges." *Id.* at PageID# 232. Further, to the extent any extra-contractual promises were made, Aetna asserts that any such promises are unenforceable due to the AXA-Aetna MSA's integration clause. *Id.* at PageID# 233.

Plaintiff asserts the two contracts' plain language, when read together, obligates Aetna to provide it with access not only to the network, but also at the same discounted rates Aetna's own customers enjoy. (R. 19, PageID# 318-319).[6] Plaintiff points to Article IV, § 4.4 of the AXA-Aetna MSA, which expressly states that: "For those medical services that an Aetna Provider provides to a Covered Person pursuant to a Plan and that AXA indicates are Covered Services, *Aetna will apply its negotiated rates* and pay that Aetna Provider for the related Claim in accordance with this Agreement."   (R. 15-1, PageID# 249) (emphasis added). Plaintiff contends this provision means that MMO was entitled to have its claims processed using "the same rates applicable to Aetna's own customers." R. 19, PageID# 322.

Ohio courts interpret contracts "with a view to ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of

---

[6] Plaintiff is correct that Ohio courts have found that "[a]s a general rule of construction, a court may construe multiple documents together if they concern the same transaction." *Ctr. Ridge Ganley, Inc. v. Stinn*, 31 Ohio St. 3d 310, 314, 511 N.E.2d 106, 109 (Ohio 1987); *accord Oryann, Ltd. V. SL & MB, L.L.C.*, 2015-Ohio-5461, ¶ 30 (Ohio Ct. App. 2015) ("Thus, all writings that are a part of the same transaction should be interpreted together, and effect should be given to every provision of every writing.") (citations omitted). Here, the AXA-Aetna MSA expressly references the MMO-AXA Agreement, causing "AXA to become claims manager of certain MMO's claims" and that the AXA-Aetna MSA is being entered so that Aetna can "provide certain services with respect to AXA's obligations … as the claims manager for MMO. Aetna accepts such engagement and shall provide certain healthcare related services under this Agreement." (R. 15-1, PageID# 246)

the instrument." *Hope Acad. Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 35, 145 Ohio St. 3d 29, 39, 46 N.E.3d 665, 674 (Ohio 2005) (c*iting S&M Constructors, Inc. v. Columbus*, 70 Ohio St.2d 69, 71, 434 N.E.2d 1349 (Ohio 1982) & *Hollerbach v. United States*, 233 U.S. 165, 171–172, 34 S.Ct. 553, 58 L.Ed. 898 (1914)). Ohio courts hold that the "intent of the parties is presumed to reside in the language they chose to use in their agreement." *Id*. (*citing Graham v. Drydock Coal Co*., 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (Ohio 1996)).

Plaintiff asserts the plain language of the contracts required Aetna to provide Plaintiff access to Aetna's network at the same rates as Aetna's customers, while Aetna contends that the agreement does not contain any such requirement. Defendant AXA's motion to dismiss makes the same argument as Aetna—except that it states that the MMO-AXA Agreement did not impose any obligation on AXA to ensure that MMO's claims were processed by Aetna at the same reimbursement rates. (R. 18-1, PageID# 301).

While the Court does *not* adopt Plaintiff's interpretation at this stage of the litigation, Plaintiff's interpretation of the AXA-Aetna MSA is certainly a *plausible and reasonable* reading of the contracts, and is not contrary to any language contained therein. Defendant Aetna has pointed to no provision of the contract that unambiguously would rule out such an interpretation. Conversely, the contract states that Aetna will apply its "negotiated rates." (R. 15-1, PageID# 249). No party has pointed to any provision in either agreement that contemplates multiple sets of negotiated rates, or language suggesting that MMO's customers will receive different "negotiated rates" than Aetna's customers. At this stage of the proceedings, where the parties offer rival

interpretations of the contract—and the contract itself is not unambiguous on the issue—dismissal is inappropriate. Thus, Aetna's argument is not well taken. Aetna essentially seeks dismissal of Plaintiff's breach of contract claim based on its own interpretation of the relevant agreements.

Defendant AXA's argument similarly fails as it is basically identical to Aetna's, except that it asserts neither contract placed any duty upon AXA to ensure that MMO's claims were processed at the same rates as Aetna's customers. (R. 18-1, PageID# 301-304). As indicated above, the MMO-AXA Agreement stated that the parties agree that Aetna's Open Choice PPO Network shall be the core Aetna network expressly utilized as the PPO; that, as a point of reference, *the reimbursement rates* in Aetna's Open Choice PPO Network is the core network utilized for approximately 89% of Aetna's membership; and, that AXA will process claims "through its Network" and arrange to have them repriced.   (R. 1-4, PageID# 75, 80). Plaintiff argues that this plain language of the MMO-AXA Agreement makes clear that: (1) AXA must process MMO's claims through the Network, and (2) the "reimbursement rates in Aetna's Open Choice PPO Network" will be used. (R. 24, PageID# 372-373). Again, Plaintiff presents a plausible and reasonable interpretation of the MMO-AXA Agreement, which is not contrary to any language identified by AXA.

Plaintiff has alleged the existence of two agreements, one predicated upon the other, and an alleged breach of said contracts.[7]  Plaintiff has alleged that Defendants

---

[7] Plaintiff has alleged that MMO was an "intended third-party beneficiary of the AXA-Aetna MSA, because Aetna's promise to allow MMO to access Aetna's Open Choice Network (including its discounted rates) on non-discriminatory terms is necessary to effectuate the intention of the parties; the circumstances indicate that both AXA and Aetna intended to benefit

Aetna and AXA breached the contracts while further alleging Plaintiff has performed its duties under the contract. "Generally, nothing more is required at this stage of the litigation." *MRI Software, LLC v. Pacific Capital Management, Inc.*, 2016 WL 1436067 at *2 (N.D. Ohio, Apr. 11, 2016) (Nugent, J.).

Based solely on the language in the four corners of the contract, the Court cannot find the language contained in the agreements incapable of the construction which Plaintiff ascribes to them in order to support its breach of contract claim. In other words, the contract provisions are ambiguous. "When a contract term is ambiguous, its construction is an issue of fact that should be determined by a jury." *Ram Intern., Inc. v. ADT Sec. Services, Inc.*, 555 Fed. Appx. 493, 503 (6th Cir. 2014) (agreeing with the district court that a contract's waiver clause was ambiguous and affirming the denial of a motion to dismiss the breach of contract claim). The existence of the agreements does not appear to be in dispute—only the issue of which parties are bound by the agreements and how the agreements should be interpreted. Further, Plaintiff's claims do not appear to be predicated upon parole evidence. Even if they were, "the parole evidence rule does not apply when extrinsic evidence is introduced to clarify ambiguous terms in the language of a written contract." *MRI Software, LLC*, 2016 WL 1436067 at *2 (*citing Williams v. Spitzer Autoworld Canton, LLC*, 122 Ohio St.3d 546, 913 N.E.2d 410, 2009-Ohio-3554 (Ohio 2009)).[8]

---

MMO by providing access to Aetna's Network at the same discounted rates as those received by Aetna; and Aetna's performance under the AXA-Aetna MSA would satisfy AXA's duty to MMO to provide MMO access to the Network in exchange for MMO's payment of fees." (R. 1, PageID# 7, ¶23).

[8] In its reply, Defendant Aetna argues the AXA-Aetna MSA is "silent" as to what rates apply to services provided to MMO's insureds. (R. 23, PageID# 352). Accepting such a construction for

Therefore, both Defendant Aetna's motion to dismiss the breach of contract claim (R. 15) and Defendant AXA's motion to dismiss the breach of contract claim (R. 18) are hereby denied.

### B. Counts Two and Three: Tortious Interference Against Defendant Aetna

#### i. Alleged Failure to Plead Intentional Conduct

In Count Two, Plaintiff asserts a claim of tortious interference with contract against Defendant Aetna; in Count Three, Plaintiff asserts a claim of tortious interference with business relationships against Aetna. (R. 1). In its motion to dismiss, Defendant Aetna argues that both of these claims fail for two reasons: (1) Aetna believes the Complaint does not allege that Aetna acted with a motive to interfere, and (2) Aetna asserts the economic loss doctrine bars both claims. (R. 15, PageID# 234-240).

Under Ohio law, the elements of tortious interference with contract are as follows: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853 at ¶2 of the syllabus (Ohio 1999).; *accord Ginn v. Stonecreek Dental Care*, 2015-Ohio-1600, ¶ 2, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 2015). Turning to a claim for tortious interference with a business relationship, the elements are as follows: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or

---

the sake of argument, the contract then is ambiguous on its face, as it fails to specify a pivotal term of the agreement. Thus, contract construction becomes an issue of fact that is to be determined by the factfinder. Further, extrinsic evidence would be necessary to clarify the ambiguous terms. Consequently, dismissing the breach of contract action would be inappropriate.

termination of the relationship; and (4) damages resulting therefrom." *Miller v. J.B. Hunt Transp., Inc.*, No. 13AP-162, 2013 WL 4807036, at *6 (Ohio Ct. App. Sept. 10, 2013) (citations omitted); *Ginn*, 2015-Ohio-1600 at ¶11 (same).

Defendant Aetna's motion to dismiss the tortious interference with contract claim is premised on an argument that the wrongdoer's intentional procurement of the contract's breach is lacking (*i.e.* that Aetna lacked the requisite motive). (R. 15, PageID# 234-236). The Court disagrees. The Complaint alleges that "[a]lmost immediately after the parties executed the [Contracts], apparently regretting the deal to which it had bound itself, Aetna engaged in a series of actions to undermine the Agreements with MMO and AXA by attempting to cause their termination." (R. 1, ¶28, PageID# 8). The Complaint alleges that Defendant Aetna "baselessly accused MMO of breaching the Agreements [and] [i]n July, 2018, shortly after the Master Services Agreement was signed, MMO received a letter from Aetna stating that it had notified AXA that MMO had communicated to the market about the network arrangement with Aetna in violation of the parties' contracts." *Id*. ¶29. The Complaint further alleges that Aetna's accusation was false, that Aetna knew it to be false, and that it was "merely a pretext intended to create for Aetna an exit strategy to terminate the Agreements and to interfere with MMO's agreement with AXA." (R. 1, ¶30, PageID# 9). The Complaint alleges that MMO was denied access to Aetna's negotiated discounts in contravention of the agreements (Aetna of course disputes that any such provision exists in the agreement). (R. 1, PageID# 10). The Complaint finally alleges that Plaintiff sent AXA letters indicating that Aetna's conduct had resulted in a material breach of the MMO-AXA Agreement. (R. 1, ¶¶42-43, PageID# 11-12). At this stage of the proceedings, the Court must accept these allegations

as true. These allegations are more than sufficient that Aetna intentionally caused the contract to be breached.

Defendant Aetna's motion to dismiss the tortious interference with business relationships claim is premised on the following argument: Plaintiff has not alleged that Aetna was aware that Plaintiff promised its customers the same discounts as Aetna's own insureds. (R. 15, PageID# 237-238). Here, the Complaint alleges that "[d]uring meetings between MMO, AXA and Aetna in the summer and fall of 2018, representatives of Aetna admitted to MMO representatives that in truth, Aetna did not want the parties' Agreements to remain in place." (R. 1, ¶31, PageID# 9). The Complaint also alleges that after Aetna was unable to amend the agreements to its liking, Aetna denied MMO access to Aetna's negotiated discounts. *Id*. ¶36. Finally, Aetna's claim—that the Complaint failed to allege that Aetna was aware that Plaintiff promised its customers the same discounts as Aetna's own insureds—is wholly untenable. The Complaint explicitly alleges that: "Aetna had knowledge of MMO's business relationships with ASO group customers, and was aware that, as an inducement to gain the business of several ASO group customers, MMO had specifically represented to the ASO groups that by contracting with MMO, they would receive the discounts Aetna had negotiated for Aetna's core Network for the claims outside of Ohio." (R. 1, ¶65, PageID# 16). The Court must accept this factual allegation as true at this stage of the proceedings.

Therefore, the Complaint sufficiently alleges an intentional interference with a business relationship claim. Defendant Aetna's motion to dismiss Counts Two and Three is, therefore, denied.

17

### ii. Economic Loss Doctrine

Defendant Aetna also contends that MMO's tort claims fail for another reason—

Ohio's economic loss doctrine "prevents recovery in tort of damages for purely economic

loss." (R. 15, PageID# 238-239, *citing Corporex Dev. & Constr. Mgmt. Inc. v. Shook,

Inc.*, 835 N.E.2d 701, 704 (Ohio 2005)).

The Court disagrees with Defendant's reading of *Corporex*, and agrees with a

prior decision from this district considering the economic loss rule:

> In *Corporex*, the Ohio Supreme Court stated that "[t]he economic-loss rule
> generally prevents recovery in tort of damages for purely economic loss."
> However, read in its proper context, it appears that the *Corporex* court was
> discussing simple negligence actions and not intentional torts. Immediately after
> the above statement, the Ohio Supreme Court quoted an earlier decision that
> specifically stated as follows: "The well-established general rule is that a plaintiff
> who has suffered only economic loss due to another's negligence has not been
> injured in a manner which is legally cognizable or compensable." *Id*. (quoting
> *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 42
> Ohio St.3d 40 (Ohio 1989) (emphasis added)).
>
> Other courts have been critical of the *Corporex* decision to the extent that it
> suggests that all torts are barred by the economic loss rule where there is a
> contract. For example, the Ninth Circuit Court of Appeals observed that the
> economic loss doctrine has caused much confusion, primarily because some
> courts have mistakenly stated in "overly broad terms that purely economic losses
> cannot be recovered in tort." *Giles v. GMAC*, 494 F.3d 865, 874 (9th Cir. 2007).
> The *Giles* court asserted that "[s]uch broad statements are not accurate [as] tort
> law has traditionally protected individuals from a host of wrongs that cause only
> monetary damage" such as fraud, fraud in the inducement, or conversion actions.
> Id. at 875 (noting that "[m]ost courts that have applied the economic loss doctrine
> beyond product liability cases have done so to bar recovery of economic loss in
> negligence and strict liability.")
>
> A prior decision of this Court declined to extend the economic loss doctrine to
> negligent misrepresentation claims. *J.F. Meskill Enters., LLC v. Acuity*, 2006 U.S.
> Dist. LEXIS 41491 (N.D. Ohio Apr. 7, 2006). The "*Corporex* [decision] thus
> makes clear that although tort claims are generally barred by the economic loss
> doctrine, the discrete tort generally referred to as negligent misrepresentation is
> not." *Id*. at *12[.]

\*\*\*

It would be inherently inconsistent to find that negligent misrepresentation claims survive the economic loss doctrine while fraud or fraud in the inducement claims do not. While the economic loss doctrine prevents a party from recovering in tort for breach of duties assumed only by contract, "fraudulent inducement involves a general duty to avoid wrongful conduct that induces a party to enter into a contract." *Onyx Environmental Services, LLC v. Maison*, 407 F.Supp.2d 874, 879 (N.D. Ohio 2005) (finding that because fraud and contract duties are distinct from one another, the economic loss doctrine does not bar plaintiff's fraud claim).

\*\*\*

It does not appear that Ohio courts intended to extend the economic loss rule beyond negligence actions to bar intentional torts as well.

*Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, No. 1:08-CV-02755, 2010 WL 6765522, at *10–11 (N.D. Ohio Sept. 2, 2010) (footnotes omitted), *report and recommendation adopted*, 2011 WL 2174365 (N.D. Ohio June 2, 2011); *see also Windsor Med. Ctr., Inc. v. Time Warner Cable, Inc.*, 2021-Ohio-158, ¶ 28, 167 N.E.3d 23, 29 (Ohio Ct. App. 2021) (finding a tort claim can proceed where the facts of the case show an intentional tort committed independently, but in connection with a breach of contract); *Eysoldt v. ProScan Imaging*, 2011-Ohio-2359, ¶ 21, 194 Ohio App. 3d 630, 637, 957 N.E.2d 780, 785 (Ohio Ct. App. 2011) (finding no Ohio cases specifically addressing the issue, but noting that federal courts interpreting Ohio law have held that the economic-loss doctrine does not apply to intentional torts).

Therefore, the Court finds that the economic loss doctrine does not preclude Plaintiff's tortious interference claims raised in Counts Three and Four.

**C.    Counts Four and Five: Unjust Enrichment and Promissory Estoppel against Defendants Aetna and AXA**

Defendant Aetna asserts that because Plaintiff MMO is a third-party beneficiary

to the AXA-Aetna MSA, under Ohio law, "a plaintiff may not recover under the theory

of unjust enrichment or quasi-contract when an express contract covers the same

subject." (R. 15, PageID# 240) (*quoting Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850,

858 (6th Cir. 2020); *Lehmkuhl v. ECR Corp.*, 2008 WL 5104747, at *5 (Ohio Ct. App.

Dec. 2, 2008) ("Ohio law is clear that a plaintiff may not recover under the theory of

unjust enrichment or quasi-contract when an express contract covers the same subject").

Defendant AXA raises the same argument in seeking dismissal of counts four and five.

(R. 18, PageID# 304-305).

Plaintiff points out that it is entitled to plead in the alternative under Federal Rule

of Civil Procedure 8(d)(2). (R. 19, PageID# 331). Indeed, Rule 8(d)(2) states that "[a]

party may set out 2 or more statements of a claim or defense alternatively or

hypothetically, either in a single count or defense or in separate ones." Furthermore, Rule

8(d)(3) specifically states that "[a] party may state as many separate claims or defenses as

it has, regardless of consistency." Defendant Aetna's reply asserts that because neither

MMO nor the Defendants dispute the existence of an express contract in this case,

Plaintiff cannot recover on an equitable theory. (R. 23, PageID# 362).[9]  Defendant AXA

echoes this argument. (R. 29, PageID# 411-412).

The Court agrees with numerous other decisions from this district that allows

alternative pleading for breach of contract and under equitable theories. *See, e.g., Minster

MinMun02, LLC v. Vill. of Minster, Ohio*, No. 3:20 CV 1784, 2021 WL 4593088, at *2

---

[9]  The Court notes that the parties have not entered a formal stipulation that the two agreements
are binding. Further, Aetna's argument ignores the potential interplay of the two contracts, and it
bears noting that Aetna's motion to dismiss expressly asserts that it is not a signatory to the
MMO-AXA Agreement and cannot have breached that agreement. (R. 15, PageID# 231).

(N.D. Ohio Jan. 7, 2021) (denying Rule 12 motion to dismiss promissory estoppel claim noting that plaintiff "may plead promissory estoppel as an alternative to the breach-of-contract claim"); *Krawczyszyn v. Columbian Life Ins. Co.*, No. 1:21 CV 85, 2021 WL 2722514, at *4 (N.D. Ohio June 30, 2021) (recognizing that "a plaintiff may not collect under both a breach of contract and a promissory estoppel" but denying a motion to dismiss because "at the motion to dismiss stage" alternative pleading is permitted); *Salling v. Budget Rent-A-Car Sys.*, No. 1:09-CV-2160, 2010 WL 11565528, at *3 (N.D. Ohio Feb. 19, 2010) (rejecting defendant's argument that that pleading an unjust enrichment claim in the alternative is only appropriate when uncertainty exists as to the validity of the underlying contract, and denying motion to dismiss); *King v. Hertz Corp.*, No. 1:09 CV 2674, 2011 WL 1297266, at *8 (N.D. Ohio Mar. 31, 2011) (acknowledging that the "existence of an express, valid contract bars an injured party's unjust enrichment claim" but finding that this general ruled does "does not prevent a plaintiff, within his complaint, from pleading both theories of recovery (breach of contract and unjust enrichment)"); c*f. Ragen v. Hancor, Inc.*, 2010 WL 301761, at *4 (N.D. Ohio Jan. 19, 2010) (denying a motion to dismiss a tortious interference claim despite its inconsistency with the plaintiff's alternative theory that a contract existed between the parties).

Therefore, Defendant Aetna's and Defendant AXA's motions to dismiss Counts Four and Five (R. 15 & 18) are DENIED.

### D. Count Six: Declaratory Judgment Against Defendant AXA

Defendant AXA asserts that MMO's declaratory judgment claim in Count Six fails as a matter of law because MMO fails to allege a breach of the MMO-AXA Agreement. (R. 18-1, PageID# 306). This argument is premised on its argument with

respect to Count One for breach of contract, which the Court rejected above. As such, Defendant AXA's argument with respect to Count Six also fails, as it is premature to determine whether AXA materially breached the agreement. Thus, the motion to dismiss Count Six is denied.

**E. Defendant Aetna's Motion to Dismiss Defendant AXA's Cross-Claim**

In this case, Defendant AXA filed a cross-claim against Defendant Aetna. (R. 14, PageID# 177-180). AXA's claim summarizes Plaintiff MMO's contention that "AXA breached the MMO-AXA Agreement and that Aetna breached the AXA-Aetna Agreement because Aetna has provided MMO with discriminatory, less favorable negotiated rates than the negotiated rates that Aetna has provided to Aetna's own customers with respect to certain providers in the Aetna Network, including, but not limited to University of Pittsburgh Medical Center ("UPMC")." *Id*. at ¶ 15.

Defendant AXA asserts that "[i]f MMO's contention is correct and AXA is ultimately found to have breached the MMO-AXA Agreement, which AXA expressly denies having breached, and/or Aetna is ultimately found to have breached the AXA-Aetna Agreement as to MMO, then Aetna has breached the AXA-Aetna Agreement as to AXA, including, but not limited to, Aetna's obligation under Section 4.4 of the AXA-Aetna Agreement to 'apply [Aetna's] negotiated rates,' and AXA has been and will be damaged as a direct and proximate result by Aetna's breach of the AXA-Aetna Agreement….." *Id*. at ¶16.

Defendant Aetna filed a motion to dismiss AXA's cross-claim. (R. 17). The crux of Defendant Aetna's argument is that "AXA's crossclaim fails because MMOs' contention is not correct. As set forth in its motion to dismiss MMO's complaint

incorporated herein, Doc. No. 15, Aetna cannot have breached the AXA-Aetna MSA because the contract does not require that the negotiated rates for MMO's insureds be the same as, or equally favorable as, the rates for Aetna's insureds." *Id*.

Because Defendant Aetna's motion to dismiss the cross-claim is premised entirely on the argument that the Court addressed and rejected *supra*, Aetna's motion to dismiss AXA's cross-claim is not well taken. Therefore, Defendant Aetna's motion to dismiss the cross-claim (R. 17) is denied.

### IV. Conclusion

For the foregoing reasons, Defendant Aetna's Motion to Dismiss (R. 15) and Defendant AXA's Motion to Dismiss (R. 18) are DENIED. In addition, Defendant Aetna's motion to dismiss the cross-claim (R. 17) is denied.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States District Judge

Date: September 28, 2023