**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MEDICAL MUTUAL OF OHIO,<br><br>Plaintiff,<br><br>v.<br><br>AXA ASSISTANCE USA, INC., *et al.*,<br><br>Defendants. | ) | CASE NO. 1:22-cv-1313<br><br>JUDGE DAVID A. RUIZ<br><br><br><br>**MEMORANDUM OPINION AND ORDER**<br>*TO BE FILED UNDER SEAL* |

Plaintiff Medical Mutual of Ohio ("MMO") filed a Complaint naming AXA Assistance USA, Inc. ("AXA") and Aetna Life Insurance Company ("Aetna") as Defendants. (R. 1). The Complaint raises six causes of action: (1) breach of contract against both Defendants; (2) tortious interference with contract against Aetna; (3) tortious interference with business relationships against Aetna; (4) unjust enrichment against both Defendants; (5) promissory estoppel against both Defendants; and (6) declaratory judgment against AXA. *Id*. Plaintiff MMO withdrew its alternative claims for unjust enrichment and promissory estoppel in light of Aetna's admission that MMO is a third-party beneficiary to the agreement between Aetna and AXA. (R. 129, PageID# 5394). Defendant AXA filed its answer, raising a breach of contract counterclaim against Plaintiff MMO and breach of contract cross-claim against Defendant Aetna. (R. 14, PageID# 173, 177). The Court previously denied Defendant Aetna's Motion to Dismiss, Defendant AXA's Motion to Dismiss, and Defendant Aetna's motion to dismiss the cross-claim

against it. (R. 31).

Now pending before the Court is Defendant Aetna's Motion for Summary Judgment (R. 94), and Defendant AXA's Motion for Summary Judgment. (R. 98).

## I. Relevant Facts

According to the Complaint, Plaintiff MMO provides group and individual health insurance to employer health plans as well as individuals throughout the State of Ohio, and also provides third-party administration and related healthcare services to self-insured employers. (R. 1, PageID# 2, ¶6). Defendant Aetna is a managed care company and one of the largest health insurers in the United States. (R. 1, PageID# 2, ¶3). Defendant AXA provides network administration services for healthcare plans (R. 1, PageID# 1, ¶2), and is a wholly owned subsidiary of the AXA Group, a Fortune 50 Company. (R. 104-24, PageID# 2894).

Aetna avers that in 2018, "AXA brokered an arrangement between MMO and Aetna for MMO to access Aetna's Open Choice PPO provider network outside of Ohio…." (R. 35, PageID# 470, ¶4). As set forth in the Court's prior order, this case involves two contracts. On June 5, 2018, MMO and AXA entered into a Master Claims Service and Management Agreement (hereinafter the "MMO Agreement"), a copy of which is attached to the Complaint as Exhibit 2. (R. 1, PageID# 5, ¶17). Thereafter, AXA and Aetna entered into a corresponding Master Services Agreement on June 11, 2018 (the "Aetna Agreement"). (R. 1, PageID# 7).[1] "Aetna admits that the AXA-Aetna MSA states that MMO is a third-party beneficiary" of the Aetna Agreement. (R. 34, PageID# 455, ¶23).

[1] Defendant Aetna attached a copy of the Aetna Agreement to it Motion to Dismiss as Exhibit A. (R. 15-1, PageID# 246-281).

**A. Pre-Contract Negotiations**

Justin Remick and Noam Baruch took part in sales and negotiations for Aetna that eventually resulted in the Aetna Agreement. (R. 106-1, PageID# 3477, Remick Depo. at 58:16-24; R. 106-2, PageID# 3607, Baruch Depo. at 14:16-16:12).[2] During the negotiations, Remick sent a proposal to Federico Preuss and David Angelone, consultants for AXA, that stated MMO would receive "the largest negotiated discount" that Aetna had in place with its network providers:

> Through Aetna's best in class network, your members will have access to a hybrid network solution called Aetna Choice POS II.[3] This hybrid solution is popular for customers as it allows them to access the highest quality facilities while benefiting from the largest negotiated discount between two networks: Open Access Managed Choice (OAMC) or Health Network Option.

(R. 101-1, PageID# 3473-74, Remick Depo. 44-48, citing R. 106-12, PageID# 4551, Pl.'s Exh. 3). In February of 2018, Remick sent an email to Angelone and Geoffrey Nagle of AXA that "Aetna will commit to providing [MMO] access to our negotiated rates for the duration of [MMO's] Master Claims Services and Management Agreement." (R. 106-1, PageID# 3481-85, Remick Depo. at 75:15-77:14, 89:9-90, citing R. 106-13, PageID# 4556, Pl.'s Exh. 6).[4] Angelone of AXA testified that it was his understanding during negotiations in late 2017 that customers of MMO were going to get access to an Aetna network, consisting of Aetna's contracts with participating providers, and that the rates Aetna had negotiated with those

[2] MMO's pre-contractual discussions occurred primarily with AXA, not Aetna. (R. 104-9, PageID# 2233, Steffany Larkins Depo. at 23:4–21). Aetna's pre-contract discussion occurred primarily with AXA (or its consultant MacroHealth). (R. 104-10, PageID# 2307-08, Nagle Depo. at 57:14-61:4).

[3] According to Aetna's Remick, he believes Aetna Choice POS II is the same thing as Aetna's Open Choice PPO network. (R. 106-1, PageID# 3474, Remick Depo. at 48).

[4] A substantially similar email was sent by Remick of Aetna in March of 2018. (R. 106-14, PageID# Pl.'s Exh. B).

providers would apply. (R. 129-3, PageID# 5511, Angelone Depo. at 31:1-17).

According to Angelone, in February of 2018, Aetna performed a "repricing exercise" to estimate the discounts MMO would experience with Aetna's Open Choice PPO network, which consisted of taking historical claims from MMO, and repricing the claims utilizing Aetna's rates for those same providers. (R. 129-3, PageID# 5527, Angelone Depo. at 94:21:97:6). Angelone told MMO that after conducting several repricings, "the projected results have been very close to the actual performance we've experienced…." (R. 129-28, PageID# 7036, Exh. 196, MMO_595). According to Angelone, in its repricing exercise of MMO's claims, Aetna utilized its Open Choice PPO discount rates. (R. 129-3, PageID# 5527, Angelone Depo. at 97:3-9). Nagle of AXA testified that MMO "wanted guarantees that the network that we had repriced would be the ones that they would be getting access to, the same reimbursement rates." (R. 129-4, PageID# 5677, Nagle Depo. at 68:12-15). After the repricing exercises, AXA summarized the results of Aetna's presentation as obtained with the "Aetna Open Choice" network, indicating that AXA estimated MMO would save $88.9 million by switching to Aetna's Open Choice PPO network. (R. 129-18, PageID# 6842, Exh. 21, MMO_000128).

MMO requested that some large health care providers with whom MMO already had proprietary contracts—such as UPMC—be excluded from the arrangement, because in some of those cases "MMO's contract with them was better than Aetna's." (R. 1295, PageID# 5812, Kathleen Golovan Depo. at 56:21-58:7). Some of those providers in Kentucky were indeed carved out. *Id*. However, MMO's request that "any providers outside Ohio with which MMO already had a provider agreement be excluded from the MMO-AXA deal" was declined by Aetna. *Id*. at 58:22-59:3. According to Golovan of MMO, Aetna and AXA's rejection of such a provision was based on their belief that it would eat into the value of the deal for AXA and

Aetna. (R. 1295, PageID# 5813, Golovan Depo. at 59:15-19).

During the contract negotiations, MMO informed AXA that it wanted Aetna's "best rate or best discount." (R. 104-10, PageID# 2327-38, Nagle Depo. at 137:21–138:17; R. 104-30, AXA-4185). Aetna countered with language suggesting the network being used by a majority of the commercial and self-funded business. *Id*. According to Remick of Aetna, "[b]ecause the reimbursement rates that Aetna is able to negotiate with providers vary (over time, by service or provider, and sometimes by payer), I communicated to AXA's consultant that Aetna could not and would not agree to give AXA, MMO or any other payer its 'best discounts' or any other particular reimbursement rate(s)." (R. 104-13, PageID# 2548, Remick Decl. at ¶7). Remick further stated that:

> On April 24, 2018, Aetna affirmatively struck "the reimbursement rates" language from the draft LOU because it was not willing to guarantee MMO anything about rates through the definition of Network. Aetna has many thousands of providers in its network at any given time and has agreed on specific rates with each of those providers, which rates often vary across providers or, for a particular provider, vary based on who the ultimate payer is. Providers at times, for a whole host of different reasons, may insist on negotiating new reimbursement rates with Aetna. At times, some providers have said they cannot honor a particular rate for all of Aetna's business and have insisted on negotiating "carved out rates," reimbursement rates that are specific to a particular payer. While Aetna in my experience always seeks to negotiate the lowest reimbursement rates it can with providers (that's our business), it occasionally is necessary to negotiate payer-specific rates in order to keep those providers in Aetna's network…. Aetna needs the freedom to negotiate and manage its provider contracts to keep providers in its network.

(R. 104-13, PageID# 2548-49, Remick Decl. at ¶8).

On or about March 22, 2018, MMO proposed provider-specific discount guarantees for major providers like the University of Pittsburgh Medical Center ("UPMC") and University of Michigan. (R. 104-28, PageID# 2925). In an email from Nagle of AXA to several individuals with MMO—Carol Bushnell, Don Pirc, Steffany Larkins, and Kathleen Golovan—sent the same

date, Nagle explained that "[w]e are unable to provide a guarantee for specific providers, however, in the implementation process we will include communication to key providers like UPMC and Univ. of Michigan regarding this transition and future acceptance/adherence to the Aetna provider contract. We will include this in the letter of intent we are currently drafting and will send your way when complete." (R. 104-27, PageID# 2914; R. 129-16, PageID# 6830).

During the deposition of Donald Pirc, Vice President of National Networks for MMO, he agreed that "the decision that MMO made to push to have multiple regions in [its] contract and then have different performance guarantees by region … [was that] by doing that, MMO would be able to push for more advantageous discounts in the border counties by structuring the performance guarantee in that fashion…." (R. 104-11, PageID# 2384, Depo. of Pirc at 66:7–16; see also PageID# 129-5, PageID# 5813, Golovan Depo. at 59:20-62:22). Pirc agreed that "the performance guarantees were MMO's protection against the financial terms of Aetna's contracts with providers changing in a manner to MMO's financial detriment." (R. 104-11, PageID# 2386, Depo. of Pirc at 74:14-20; *see also* R. 104-2, PageID# 1832, Depo. of Carol Bushnell at 60:8–61:10; R. 104-25, PageID# 2904). These performance guarantees can be found in Appendix C to the MMO and Aetna Agreements. (R. 1-4, PageID# 94; R. 94-4, PageID# 1405). Pirc of MMO stated in a March 15, 2018 email that "[t]he reason we want a separate Discount Guarantee around the border is that we think it is THESE area's [sic] that will push back on Aetna when they see we are paying less thru their network." (R. 104-25, PageID# 2905, MMO_061896).

Depending on the percentage of an overall discount shortfall realized in each of the three "Regions," Aetna would provide a "Savings Rebate in Fees." (*Id.*; R. 104-11, PageID# 2384-86, Depo. of Pirc at 69:16–71:25; 74:5–20). The Aetna contract allowed AXA to terminate or renegotiate the agreement with notice for a particular region if performance guarantees fell

below a certain threshold percentage in a region. (R. 94-4, PageID# 1405, 1408, 1410).[5]

During his deposition, Nagle of AXA was asked whether the Aetna agreement's designation of the Open Choice PPO Network as the *primary* network was intended to indicate that "in some circumstances, MMO's members may get access to another Aetna network?" (R. 129-4, PageID# 5697, Nagle Depo. at 146:22-147:1) (emphasis added). Nagle responded as follows:

> Well, my understanding was that if the provider participated in the Aetna Open Choice network, Medical Mutual could access the discount that the provider has with that network. If the provider was not participating in the network or not -- or "nonpar" as they say, Medical Mutual – Medical Mutual could use a different network for that, whether that's another lease network or wrap network or what have you.

(R. 129-4, PageID# 5697, Nagle Depo. at 147:3-12).

**B. The MMO Agreement**

As stated above, MMO and AXA entered into the MMO Agreement, and Aetna asserts it is an intended third-party beneficiary of said agreement. (R. 34, PageID# 465, ¶20). The agreement defines the network as follows:

> 1.7 Network. The term "Network" means a network of participating Providers who, as independent contractors have entered into contractual arrangements to provide Covered Services to Covered Persons in a Plan and to **accept fees for those services at contracted rates**. The parties agree that Aetna's Open Choice PPO Network, including Aetna's National Advantage Program ("NAP"), shall be the primary Network for these Services, and all future networks accessed by Client even if name of the network is changed shall be the core Aetna network expressly utilized as the PPO network for the majority of all commercial Self-Funded customers of Aetna's and the network covering most of commercial insured business of Aetna. As of March 30, 2018, and as a point of reference **the reimbursement rates in Aetna's Open Choice PPO**

[5] Appendix C to the MMO Agreement also gave MMO ("Company") largely the same renegotiation/termination remedies in relation to AXA ("Claims Manager") as the Aetna Agreement. (R. 1-4, PageID# 94-101).

> **Network is the core network utilized for approximately 89% of Aetna's membership**….

(R. 1-4, PageID# 75) (emphasis added).[6]

The Claims Appointment Addendum § 4.4 further states that AXA will process claims "through its Network" and that "Claims Manager shall arrange to have Claims from Providers repriced" though MMO remained responsible for payment of Claims. (R. 1-4, PageID# 80).

Remick of Aetna agreed during his deposition that the "intention of the deal was to give MMO access to the Open Choice rates." (R. 106-1, PageID# 3508, Remick Depo. at 182:7-10). Baruch of Aetna similarly agreed that "[t]he intention was for MMO to have access to the providers and the negotiated rates that existed at the time those contracts were signed." (R. 106-2, PageID# 3612, Baruch Depo. at 36:25-37:9). However, Remick stated that Aetna was not "apprised" of the MMO Agreement with AXA. (R. 104-12, PageID# 2421, Remick Depo. at 59:1-60:5).

Under the MMO Agreement, with a number of exceptions, MMO was required to "exclusively utilize the Network to obtain Savings for all Providers outside of the state of Ohio …." (R. 1-4, PageID# 92).[7] Consistent with this agreement, Khalilah Hall, sales lead for Aetna, indicated that Aetna expected MMO to terminate any direct contracts that it had with providers for medical services outside of Ohio. (R. 106-3, PageID# 3680, Hall Depo. at 41:10-43:2).

---

[6] Defendant Aetna believes the absence of the underlined language in its agreement with AXA is significant, even dispositive. The Court is unconvinced, as even the Aetna Agreement required Aetna to apply its "negotiated rates" with providers and says nothing about Aetna retaining the right to negotiate custom rates that are solely applicable to MMO (and less favorable).

[7] A substantially similar provision exists in the Aetna Agreement limiting MMO to Aetna's networks outside of Ohio with a number of exceptions. (R. 14-1, PageID# 204).

### C. The Aetna Agreement

Section 1.7 of the Aetna Agreement between AXA and Aetna defines Network as follows:

> **1.7** <u>**Network**</u>, means the Aetna network of participating Aetna Providers who, as independent contractors have entered into contractual arrangements with Aetna to provide Covered Services to Covered Persons in a Plan and to **accept fees for those services at contracted rates**. The parties agree that Aetna's Open Choice PPO Network, including Aetna's National Advantage Program ("NAP"), as well as any future network accessed by MMO, even if the name of the network has changed, that is expressly utilized as the PPO network for the majority of all commercial or self-funded customers of Aetna's, shall by [sic] the primary Network for these services. As of March 30, 2018, and as a point of reference, Aetna's Open Choice PPO Network is the core network utilized for approximately 89% of Aetna's membership.

(R. 94-4, PageID# 1383, ¶1.7) (emphasis added).

Section 4.1 of the Aetna Agreement states that "Aetna shall use commercially reasonable endeavors to provide access for Covered Persons to Aetna Providers." (R. 94-4, PageID# 1385). Pursuant to Section 4.3, "[f]or Covered Persons who elect to receive Covered Services from an Aetna Provider … Aetna will receive the Claim for such service from the Aetna Provider or from MMO, *reprice through its Network*, and send AXA a report of such services through a mutually acceptable electronic data interchange …. " *Id*. Section 4.4 states that:

> 4.4 For those medical services that an Aetna Provider provides to a Covered Person pursuant to a Plan and that AXA indicates are Covered Services, **Aetna will apply its negotiated rates and pay the Aetna Provider** for the related Claim in accordance with this Agreement.

(R. 94-4, PageID# 1385) (emphasis added).

Section 14.1.1 of the Aetna Agreement provided that either party could terminate the agreement with a 90-day prior written notice in the event of default, where the defaulting party "failed to take reasonable steps to remedy such default within (sixty) 60 days of notice of such

default." (R. 94-4, PageID# 1396). "Negotiated rates" are not defined by this agreement. The agreement is silent about "carve-out" rates or custom rates applicable to MMO only.

**D. Post-Agreement Developments**

**1. Discontent Inside Aetna**

Not long after the aforementioned agreements were signed, a number of Aetna employees complained that the agreements would allow MMO to use its new access to Aetna's networks to compete directly with Aetna for other insurance business inside Ohio. (R. 106-1, PageID# 3508, Remick Depo. at 109:9-110:7; R. 106-15, PageID# 4560-63, Pl.'s Exh. 14).

On June 20, 2018, not even ten days after the Aetna Agreement, Aetna employee Sheryl Burke wrote: "Our primary concern is to shut down MMO access to the network through AXA, and to ask MMO to stop reaching out to clients." (R. 106-22, PageID# 4591, Pl.'s Exh. 45, PageID# 4591, AET 13698). Bradley Fischer, Aetna's market president in Ohio and Kentucky, responded: "We need to discuss this ASAP. I need to get this shut down immediately!!" (R. 106-4, PageID# 3783-95, Fischer Depo. at 11:14-13:12, 32:13-33:13, 54:15-60:11; Pl's Exh. 45, PageID# 4590, AET 13697).

On July 3, 2018, Aetna sent a letter to AXA's general counsel accusing MMO and AXA of materially breaching the Agreements by discussing them in the marketplace for purposes of unfairly competing against Aetna. (R. 129-17, PageID# 6835-36, Exh. 16, AET_013804). It was the opinion of AXA's general counsel that allegations by Aetna were nothing but a pretext by Aetna to try to create grounds to terminate the Agreement. (R. 129-6, PageID# 5929, George Depo. at 62:20-63:8).

In the fall of 2018, according to the head of AXA's legal department, Aetna initiated discussions about amending the Agreements to include a non-compete amendment and, during

the exchange of drafts, Aetna "shocked" AXA by including in a proposed draft a re-definition of the "Network" to eliminate the reference to the majority of Aetna's self-funded customers, and to add to the Network definition a reference to the Performance Guarantee. (R. 129-8, PageID# 8, Brenda Lang Depo. at 8:8-18, 82:1-84:15, 88:1-89:13).

In a November 20, 2018 email, Aetna's Market Head of Network wrote that "[MMO was] terming [their provider agreements] … b/c we are renting our network (at CPII rates) to them... So MMO will be using the Aetna network and our rates in replace of their own deals." (R. 106-33, PageID# 4639. AET_004108). The CP II rates were Aetna's commercial rates. (R. 106-9, PageID# 4403, 4414, Richard Depo. at 37:19-25, 78:6-15).[8]

As early as December 4, 2018, an internal Aetna email indicated the "MMO/AXA deal could end in litigation." (R. 129-19, PageID# 6851, AET_014762).

On December 5, 2018, Aetna employee Beth Sullivan asked Fischer, "Is there a way to exclude our hospital customers from the arrangement that will grant MMO access to the national Aetna network deep discounts?" (R. 106-4, PageID# 3827-, Fischer Depo. at 189:2-23; Pl.'s Exh. 59, PageID# 4597, AET 14741).

On December 10, 2018, Richard of Aetna lamented that "we just lost a case (Trinity) to MMO because they could offer UPMC at Aetna rates...." (R. 106-16, PageID# 4565, AET_014888).

According to Larkins of MMO, Aetna's Head of Sales for North America was unhappy about the announcement that went out about the contract between MMO, AXA and Aetna. (R.

---

[8] In a November 2021 email, Richard of Aetna summarized the situation as "Aetna International rented the Aetna PPO network to MMO through AXA and the expectation was that providers would accept the PPO rates," but that UPMC objected and stated that Aetna was in breach of contract. (R. 106-49, PageID# 4704, AET_017256).

129-7, PageID# 6089, Larkins Depo. at 123:20-125:3). Larkins recalled that Mayhew stated Ohio was Aetna's sixth largest market and "that we'd put him out of business. He said our contracts don't allow us to be leasing to a health plan." *Id*. at 125:10-125:124. Mayhew proposed two other networks as alternatives to the Open Choice PPO network for MMO. (R. 129-7, PageID# 6090, Larkins Depo. at 126:20-127:20). At a subsequent 2019 meeting in Hartford, Larkins testified that Aetna attempted to get MMO to agree to using a different network. *Id*. at 135:16-22.

**2. Providers Unhappy with Aetna's Agreements Involving MMO**

A number of medical providers in the Aetna Open Choice PPO network also appeared to be dissatisfied with Aetna after learning the Aetna and MMO Agreements would allow MMO to access Aetna's Network, as that would result in the providers getting reimbursed at Aetna's lower rates. (R. 160-1, PageID# 3506, Remick Depo. at 174:24-175:13; R. 106-5, PageID# 3914, R. 106-5, PageID# 3914, Gaetano Depo. at 102:22-103:14;[9] R. 106-4, PageID# 3801, Fischer Depo. at 84:17-85:20; R. 106-6, PageID# 4025-26, Norman Depo. at 81:22-82:9). In February of 2019, after the contract went live, according to an internal email from MMO's Pirc to other MMO employees, MMO met with AXA and Aetna:

> Aetna/AXA suggested that we inform any providers who complain that we are NOT renting the Aetna network, rather we are an ASO customer just like any other ASO customer, which is why they send the claim to Aetna and are paid by Aetna. They told us that if this does not resolve the problem then they will let the local Aetna Contracting team know and they will intervene. They asked us to keep the lines of communication open and let them know of any rumblings we are hearing. I told them that the Parkview Contracting leader is not happy and that it is likely UPMC is not be happy either. They shared with us that UPMC already reached out to Aetna and that they are having discussions.

[9] Antonia Gaetano was director of network management at Aetna. (R. 106-5, PageID# 3892, Gaetano Depo. at 17:1-21:24).

(R. 129-20, PageID# 6854, MMO _6796).

**3. Carve-Out Agreements**

Thereafter, Aetna entered into contracts with the following four medical provider groups—the University of Pittsburgh Medical Center ("UPMC"), King's Daughters Health System ("King's Daughter"), Steward Sharon Regional Health System ("Steward Sharon Health"), and Our Lady of Bellefonte Hospital ("Our Lady") (collectively, the "Carved-Out Providers")— "that provided different reimbursement rates for services provided to MMO's members who used the Aetna Open Choice PPO Network than for the same services provided to Aetna's insureds who used the Aetna Open Choice PPO Network." (R. 99-12, PageID# 1627-28, Exh. K, Aetna's Responses to AXA's First Interrogatories, No. 1).

Norman of Aetna testified that the Carved-Out Providers "were not satisfied with the rates they would have gotten if the Aetna contracted rates applied to MMO." (R. 106-6, PageID# 4051, Norman Depo. 184:24-185:6).[10] She further stated that "[w]hen providers did not want to continue to treat MMO members at Aetna's contracted rates, the network management worked with providers" and in some situations, negotiated a new rate with providers applicable only to MMO. *Id*. at PageID# 4037, Norman Depo. at 128:20-129:4).

Gaetano, Director of Network Management for Aetna, testified that UPMC, one of the largest hospital systems in the area, approached Aetna with concerns about MMO members accessing its services through the Open Choice PPO Network at then-existing rates. (R. 104-4, PageID# 1941-43, Gaetano Depo. at 51:6–10). UPMC took the position that MMO's access to the network was a "medical rental" and Gaetano indicated that Aetna thereafter made an internal

[10] Claudia Norman was a senior network manager at Aetna during the relevant time frame. (R. 10606, PageID# 4008, Norman Depo. at 10:2-11:11).

determination and agreed with UPMC's characterization. (R. 104-4, PageID# 1941-43, 1963, Gaetano Depo. at 51:6–10, 130:9-15;). Steward Sharon Health also claimed it was entitled under its contract with Aetna to payment of higher fees at "rental network" reimbursement rates, causing Aetna to worry it could potentially lose the provider from its network. (R. 104-4, PageID# 1991, Gaetano Depo. at 203-14-25; R. 104-46, PageID# 3104-3105).[11]

Aetna's Market Head of Network, Richard, instructed Gaetano that "if providers come to us with [MMO's access to Aetna's provider rates] as an issue... negotiate to the best of our ability, but don't let it damage our core business rates/relationships. Separate but similar note, I would like to tell UPMC today we are fine giving them the rates they requested..." (R. 106-36, PageID# 4649, Exh 121, AET_004158).

According to the testimony of Lisa Gatliff, Aetna's Network Manager for the Kentucky market, King's Daughter and Our Lady threatened to terminate their contracts with Aetna over MMO's use of Aetna's network at commercial (rather than rental) rates. (R. 104-5, PageID# 2025-26, Gatliff Depo. at 129:19-130:19, 134:16-135:19; 140:15-22). Our Lady's withdrawal from Aetna coverage would have left a "geographic area without coverage and members would have to seek care in that community from a nonparticipating provider or they would have to travel outside of their community for services" as it was the sole provider in the area. *Id*. at 135:2-136:39).

Kate Karwelies, vice president of Sales for Aetna for the East Coast, acknowledges in her

[11] According to Angelone of AXA, "rental" networks generally have less favorable discounts than a shared administration network like the Open Choice PPO network. (R. 129-3, PageID# 5521, Angelone Depo. at 72:25-73:15). Prior to MMO's agreement with Aetna through AXA, MMO had a contract with First Health Corp. through which MMO accessed First Health's rental network for claims outside of Ohio. (R. 129-14, PageID# 6803, Exh. Y, Gillespie Decl. at ¶3).

deposition that the carve-outs for MMO with King's Daughter and Our Lady yielded a "low discount" for MMO. (R. 106-7, PageID# 4178-79, Karweiles Depo. at 53:18-54:22). King's Daughter and Our Lady demanded that Aetna accept a reimbursement rate of 98% of billed charges (only a 2% discount) for MMO, and that Aetna acceded to their demands. (R. 106-8, PageID# 4314-42, Gatliff Depo. at 43:25-45:25, 58:3-25, 98:23-99:13, 155:8-156:21).

Norman of Aetna testified that "[i]t was [Aetna's] desire to preserve the Aetna contracted rates for MMO." (R. 106-6, PageID# 4027, Norman Depo. at 88:24-89:10). Norman agreed that "[t]he Aetna contracted rates were the commercial rates that Aetna had negotiated for everyone who participated in the Aetna Open Choice network." (R. 106-6, PageID# 4027, Norman Depo. at 89:11-89:16).

With respect to UPMC and Sharon Steward Health, Andrew Richard, Market Head of Network for Aetna, acknowledged during his deposition that UPMC's position was that Aetna breached its contract with UPMC, as it was offering a rental network to MMO. (R. 106-9, PageID# 4396, 4441; Richard Depo. at 9:15-9:18, 189:6-11). Richard of Aetna agreed with the characterization that MMO had a rental agreement and "there wasn't going to be a negotiation," as Aetna would give them the rental network rate. *Id.*[12] Notably, Remick, who negotiated the Agreements on behalf of Aetna, testified that the Agreements did *not* create a rental network, indicating that it was a claim administration agreement, but that providers sometimes get the two confused. (R. 106-1, PageID# 3505-06, Remick Depo. at 173:10-174:8). His understanding was that Aetna does not allow its network to be rented. *Id*. at 173:18-19. Aetna's senior network manager also took the position that the agreement with AXA and MMO was "**not a rental**

[12] MMO did not participate in the negotiations between Aetna and UPMC resulting in the carve-out rate. (R. 106-5, PageID# 134).

**network**" because Aetna handled the claims administration, paid the providers, and handled eligibility/benefit management. (R. 129-19, PageID# 6851, Exh. 26, AET_014762) (emphasis in original).

Angelone of AXA testified that Aetna allowing providers to bill MMO's customers at First Health rates was significant, because the First Health rental network generates an approximately mid-30 percent discount for MMO, while Aetna's Open Choice PPO network would generate an approximately 50-percent discount with respect to the exact same providers. (R. 129-3, PageID# 5521, Angelone Depo. at 72:2-72:19).

On August 21, 2019, Norman sent an email to Remick and Hall indicating that "We need to know how those existing agreements [of MMO] compare to Aetna's contracted rates? If they are not as favorable—providers will more than likely asked [sic] to be carved out or threaten not to treat members—similar to what UPMC did." (R. 106-3, PageID# 3677, Hall Depo. at 30:12-33:20; R. 106-43, PageID# 4673, Exh. 153, AET 16071) (emphasis added).

On January 6, 2020, Norman emailed Hall and Karwelies and stated as follows:

> UPMC and Steward Sharon Health providers have custom rates specific to AXA/MMO only that were effective January 1, 2019. UPMC is at 70% of billed charges and Steward Sharon Regional Health System is at 80% of billed charges for all hospitals and affiliated physicians. **These hospitals would not agree to take/see MMO membership at Aetna's contracted rates.**

(R. 106-3, PageID# 3687, 3708-09, Hall Depo. at 73:1-75:20, 156:18-159:21; R. 106-26, PageID# 4618, ExH. 91, AET 5617 (emphasis added)). On January 10, 2020, Norman asked Aetna employees some questions about the MMO carve-outs with King's Daughter and Our Lady, including, "What's the Aetna rate? And can you tell me what the Aetna rate was in 2016?" (R. 106-53, PageID# 4744, Exh. 232, AET 29004). Barbara Durr of Aetna responded to

Norman's questions with a table, which distinguished between the "Aetna Rate" and the "Custom Rate AXA" which showed that the custom rate for AXA (and thereby MMO) was "98% BC" versus 73.9% to 81.8% at the Aetna rate. (R. 106-8, PageID# 4326, Gatliff Depo. at 91:25-93:25; R. 106-53, PageID# 4744, Ex H. 232, AET 29004). On January 13, 2020, Hall circulated to Aetna employees a spreadsheet summarizing whether there were carve-outs for MMO as to certain medical providers. (R. 106-28, PageID# 4623-24, Exh. 93, AET 5726). Norman agreed that Aetna's rates with the Carved-Out Providers were "Aetna's contracted rates for those hospitals." (R. 106-6, PageID# 4048, Norman Depo. at 172:21-174:6).

Aetna did not grant every request for a carve-out. The University of Michigan was not carved out. (R. 104-7, PageID# 2131, Karwelies Depo. at 82:2-7; 85:3-9). Allegheny Health was also unhappy, but Senior Network Manager Norman indicated that "[w]e need to avoid another carve out at all costs" (R. 106-6, PageID# 4051, Norman Depo. at 185:10-24). Norman explained that additional carve outs would not have been in MMO's best interest. *Id*. at 185:6-9.

**4. AXA's and MMO's reaction to the carve-outs.**

Karwelies of Aetna testified that he believes AXA and MMO first learned about the new arrangements made with the Carved-Out Providers during a January 2020 meeting where he told them about the carve-out agreements, about a year after they occurred. (R. 106-7, PageID# 4183, 4189-92, Karwelies Depo. 73:3-17, 97:9-17, 98:23-103:5, 108:9-109:17; R. 106-29 & R. 106-30, PageID# 4628-32, Exhs. 94 & 95, AET 5904, 5733).

On January 29, 2020, AXA sent a letter to Aetna protesting the carve-outs, asserting that they amounted to "discriminatory pricing practice [that] is not in accordance with Master Services Agreement" between AXA and Aetna. (R. 106-25, PageID# 4612; Exh. 77, AXA 95425). AXA demanded that "Aetna take immediately [sic] action to rectify any discriminatory

pricing practice" and that Aetna cease any further negotiations with medical providers that targeted AXA or MMO. *Id*.

## II. Standard

Summary judgment is appropriate only if the moving party demonstrates there is no genuine dispute of material fact on an issue that would entitle the movant to judgment as a matter of law. Fed.R.Civ.P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the non-movant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is only genuine, however, if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III. Analysis

### A. Breach of Contract: MMO's Count One Against Aetna and AXA's Cross-Claim Against Aetna[13]

[13] There appears to be no dispute that Ohio law applies, as both the MMO Agreement and the Aetna Agreement have clauses stating "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Ohio[.]" (R. 1-4, § 16.3, PageID# 59; R. 15-1, Exh. A., § 19.3, PageID# 264).

In its motion for summary judgment with respect to the breach of contract claim, Aetna argues it cannot have breached the MMO Agreement to which it was never a party. (R. 104, PageID# 1716). This argument is moot, as MMO's position is that Aetna breached the Aetna agreement of which MMO is an acknowledged third-party beneficiary.[14] Aetna also asserts it complied with all of its obligations under the Aetna Agreement, and further argues that even if carved-out rates meant that MMO members were accessing something other than the Open Choice PPO Network, it nonetheless complied with the Aetna Agreement, which only promised that the Open Choice PPO Network would be "the primary" network for providing services to MMO's customers. (R. 104, PageID# 1716, 1725-27).

MMO counters that the Aetna agreement's language supports the interpretation that Aetna promised to give MMO access to the Open Choice PPO network at the same rates other Aetna customers received. (R. 129, PageID# 5370). Further, MMO asserts that the reference to "primary" network was merely an acknowledgement that while MMO would access Open Choice PPO rates for any providers participating in said network, for claims that were "nonpar" (*i.e.* because a provider did not participate in the Open Choice PPO network), MMO could use a different "wrap network." (R. 129, PageID# 5370, citing R. 129-4, Nagle Depo. at 146:22-147:12). MMO further asserts that Aetna's post-contract conduct illustrates that Aetna understood the Aetna Agreement entitled MMO to the same negotiated rates applicable to all Open Choice PPO participants. (R. 129, PageID# 5371).

---

[14] In its Brief In Support of Summary Judgment, Aetna states that "[w]hile Aetna is not a signatory to the MMO Agreement, there is no disagreement that the Aetna Agreement, of which MMO is admittedly a third-party beneficiary, governs any obligations Aetna could owe to MMO." (R. 104, PageID# 1732).

Conversely, AXA has also moved for summary judgment against Aetna on its cross-claim for breach of the Aetna Agreement. (R. 98). AXA argues that Section 4.4 of the Aetna Agreement requires Aetna to *apply its negotiated rates* and Aetna's emails, documents, and deposition testimony, compels only one plausible interpretation—that Aetna agreed that MMO and its members would receive the same rates that applied to Aetna and its members. (R. 106, PageID# 3448).

**1. Applicable Summary Judgment Rules for Breach of Contract Claims**

A special interpretive framework applies when a court entertains a summary judgment motion in a breach of contract case:

> ... [A] contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity.... If the court finds no ambiguity, it should proceed to interpret the contract—and it may do so at the summary judgment stage. If, however, the court discerns an ambiguity, the next step—involving an examination of extrinsic evidence—becomes essential.... Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations.

*United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004) (quoting *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999)); *accord Gardner v. Flagstar Bank, FSB*, No. 24-1436, 2025 WL 1721191, at *3 (6th Cir. June 20, 2025); *Home Depot U.S.A., Inc., v. Turf Development, LLC*, No. 5:25-CV-142-KKC, 2026 WL 2137836, at *3 (E.D. Ky. July 24, 2026) ("Resolving an ambiguity is generally a fact question for the jury."); *see also Manley v. Plasti-Line, Inc.*, 808 F.2d 468, 471 (6th Cir. 1987) (stating that "disputed questions of contractual intent are considered factual issues which are precluded from summary resolution.")

As stated in the Courts earlier Order, "the parole evidence rule does not apply when

extrinsic evidence is introduced to clarify ambiguous terms in the language of a written contract." *MRI Software, LLC v. Pacific Capital Management, Inc.*, 2016 WL 1436067 at *2 (N.D. Ohio, Apr. 11, 2016) (Nugent, J.) (citing *Williams v. Spitzer Autoworld Canton, LLC*, 122 Ohio St.3d 546, 913 N.E.2d 410, 2009-Ohio-3554 (Ohio 2009)). Evidence that can clarify the terms of an ambiguous contract include the following: "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St. 3d 524, 526-27, 71 N.E.3d 1010, 1012 (Ohio 2106); *accord Klopfenstein v. Fifth Third Bank*, 2023 U.S. Dist. LEXIS 80517, *11 (S.D. Ohio Mar. 29, 2023).

The parol evidence most commonly employed for determining the intent of the parties is "evidence of the negotiations leading to the agreement." *Dorsey v. Contemp. Obstetrics & Gynecology, Inc.*, 113 Ohio App. 3d 75, 85, 680 N.E.2d 240, 246 (Ohio Ct. App. 1996) ("[A]ny dealings the parties have had relevant to the situation in dispute may be considered in determining what their expectations were concerning it.") "The parties' conduct that 'reflects their understanding of the contract's meaning' is relevant extrinsic evidence." *Jaskiewicz v. ITG Commc'ns*, LLC, 2023 U.S. Dist. LEXIS 12673, *55 (M.D. Tenn. Jan. 25, 2023) (citing Williston on Contracts § 30:1 (4th ed.)); *see also Veritas Indep. Partners, LLC v. Ohio Nat'l Life Ins. Co.*, 2025 U.S. Dist. LEXIS 22708, *12, 2025 WL 437266 (S.D. Ohio Feb. 7, 2005) (observing that when evidence of the parties' precontract negotiations has proven inconclusive, courts have relied upon the parties' course of dealing and other "post-contract formation conduct").

**2. Analysis**

Defendant Aetna's reply brief in support of its motion for summary judgment makes clear that Aetna is essentially rehashing some of the arguments this Court rejected in Aetna's motion to dismiss — that the Aetna Agreement is not ambiguous and the issue of whether Aetna could apply any reimbursement rate it chose is answered by the "plain meaning of Section 4.4 on its face." (R. 134, PageID# 7373). Aetna further argues that because the agreement states that Open Choice PPO shall be the "primary " network (rather than the "sole" or "exclusive" network), the agreement permitted Aetna to carve out a number of providers, including one of the larger hospital systems in the area, and create special, yet disadvantageous rates, just for MMO. *Id*. These arguments are tantamount to a second bite at the apple.

The Court has already determined that the contract is ambiguous, as the Aetna contract "states that Aetna will apply its 'negotiated rates.'" (R. 15-1, PageID# 249). "No party has pointed to any provision in either agreement that contemplates multiple sets of negotiated rates, or language suggesting that MMO's customers will receive different 'negotiated rates' than Aetna's customers." (R. 31, PageID# 429).[15] Therefore, a key component of the Aetna Agreement remains ambiguous.

**a. Aetna's Request for Summary Judgment**

With respect to Aetna's motion for summary judgment on MMO's and AXA's respective breach of contract claims, the Court must construe the evidence in the light most favorable to MMO and AXA as the non-moving parties.

---

[15] Aetna's brief in support of summary judgment even acknowledges that "provider contracts **usually do not set different reimbursement rates based upon the payer**." (R. 104, PageID# 1723) (emphasis added).

Aetna argues that simply because it created custom rates for MMO with only four separate providers, that does not mean that MMO was participating in a *different* network than the agreed upon Open Choice PPO network. Aetna avers the vast majority of MMO's claims utilized the remainder of the network that charged the same rates to MMO's customers as Aetna's other customers. (R. 104, PageID# 1725-26). The Court finds this argument unconvincing. First, the issue of whether the carve-out agreements so degraded the network that MMO was essentially accessing a custom network or a watered-down version of the Open Choice PPO network is an issue of fact for the jury to decide. Moreover, even if the Court were to find that Aetna fulfilled the provision of the agreement that required it to provide access to MMO customers to its Open Choice PPO network, such a finding would not result in summary judgment in Aetna's favor. Whether MMO was granted access to the agreed upon network of providers does not resolve the ambiguity around the meaning of "negotiated rates" in the Aetna Agreement.

Aetna's argument that the Aetna Agreement required that Open Choice PPO be the "primary" network for services to MMO members rather than the "exclusive" or "sole" network (R. 104, PageID# 1726-27) fails for the same reason, as it also does not remove the ambiguity around the meaning of "negotiated rates" in the Aetna Agreement. As explained in this decision, the extrinsic evidence is not so one-sided as to entitle any party to summary judgment. Moreover, there is testimonial evidence from AXA's Nagle that the inclusion of the "primary network" was merely to acknowledge that if a provider was not participating ("nonpar") in the Open Choice PPO network, then "Medical Mutual could use a different network for that, whether that's another lease network or wrap network or what have you." (R. 129-4, PageID# 5697, Nagle Depo. at 146:22-147:3-12). While a juror could disbelieve this testimony, the Court

cannot ignore it.

Previously when addressing the motions to dismiss, Plaintiff advanced the argument that the contracts required Aetna to provide Plaintiff access to Aetna's network *at the same rates as Aetna's customers*, a position it reiterates. The Court determined that while it was not adopting Plaintiff's interpretation of the agreements, said interpretation was plausible. (R. 31, PageID# 429). Even confining the Court's consideration of the issue to the language in the Aetna Agreement, the "negotiated rates" language and some of the extrinsic evidence presented continues to support the position that Plaintiff's interpretation is reasonable. The Court points to the following *non-exhaustive* list of evidence that support the proposition that the parties intended Aetna to apply the same rates to MMO's customers as its own in the Open Choice PPO network.

First, the Court gives greater weight to the pre-contractual discussions of the parties' than post-contractual developments in finding that genuine issues of material fact remain. Nonetheless, a number of post-contractual actions are relevant in ascertaining the parties' intent.

During the negotiations, **Aetna's negotiator** sent a proposal to AXA's consultants stating that its customer (MMO) would benefit from "the largest negotiated discount" that Aetna had in place with its network providers. (R. 101-1, PageID# 3473-74, Remick Depo. 44-48, citing R. 106-12, PageID# 4551, Pl.'s Exh. 3). The same Aetna negotiator sent an email stating that "Aetna will commit to providing [MMO] access to our negotiated rates for the duration of [MMO's] Master Claims Services and Management Agreement." (R. 106-1, PageID# 3481-85, Remick Depo. at 75:15-77:14, 89:9-90, citing R. 106-13, PageID# 4556, Pl.'s Exh. 6). While admittedly this email does not say "best" rates or "largest discount," the commitment to providing the negotiated rates for the duration of the agreement is rather hollow if Aetna could

negotiate one set of rates for its own customers and a separate disadvantageous rate for MMO. One of AXA's negotiators testified that it was his understanding during negotiations that MMO was not just getting access to an Aetna network, but that the rates Aetna had negotiated with those network's providers would apply. (R. 129-3, PageID# 5511, Angelone Depo. at 31:1-17).

In addition, there is evidence that Aetna performed a "repricing exercise" to illustrate the discounts MMO would experience with Aetna's Open Choice PPO network using past historical claims from MMO, and repricing the claims utilizing Aetna's Open Choice PPO discount rates. (R. 129-3, PageID# 5527, Angelone Depo. at 94:21-97:9). This exercise could reasonably be construed as evincing Aetna's intent to give MMO the *same rates* as its own customers in the Open Choice PPO network. Arguably, nothing in the Aetna Agreement contradicts such an understanding.

There also exists evidence, cited in Part I-D-1 of this decision, that almost immediately after the Aetna Agreement was entered, a number of Aetna employees came to the conclusion that it allowed MMO to be competitive with Aetna and wanted to "get this shut down immediately!!" (R. 106-4, PageID# 3783-95, Fischer Depo. at 11:14-13:12, 32:13-33:13, 54:15-60:11; Pl's Exh. 45, PageID# 4590, AET 13697; *see also* R. 106-22, PageID# 4591, Pl.'s Exh. 45, PageID# 4591, AET 13698)). Although less probative than pre-contractual negotiations, this evidence could reasonably be construed as providing motivation for Aetna to provoke a breach of contract. In a similar vein, Aetna sent a letter to AXA's general counsel accusing MMO of breaching the Agreements by discussing them in the marketplace for purposes of unfairly competing against Aetna—an assertion which AXA's general counsel believed was pretext to create grounds to terminate the Agreement. (R. 129-6, PageID# 5929, George Depo. at 62:20-63:8; R. 129-17, PageID# 6835-36, Exh. 16, AET_013804).

Also, there is evidence that in the fall of 2018, Aetna initiated discussions about amending the Agreements to include a non-compete amendment and, during the exchange of drafts, Aetna "shocked" AXA by including a proposed re-definition of the "Network" to eliminate the reference to the majority of Aetna's self-funded customers in the draft. (R. 129-8, PageID# 8, Brenda Lang Depo. at 8:8-18, 82:1-84:15, 88:1-89:13). This could be construed by a reasonable trier of fact as Aetna trying to either sabotage the Agreements or to alter the Agreements so Aetna would no longer have to reprice MMO's customers claims at the same rate as their own customers. MMO's understanding of the Aetna Agreement is also buttressed by a post-contractual email from Aetna's Market Head of Network stating that MMO had terminated its own provider agreements because it was renting Aetna's "[s]o MMO will be using the Aetna network and our rates in replace of their own deals." (R. 106-33, PageID# 4639; AET_004108; R. 106-9, PageID# 4403, 4414, Richard Depo. at 37:19-25, 78:6-15). As late as April of 2022, Tanya Uhlig, the chief of staff for Aetna employee Mark Santos (who was in charge of profits and losses for Aetna) prepared a presentation about the Aetna-AXA-MMO arrangement for Aetna President Daniel Finke and Aetna's CFO, Les Carter. (R. 106-10, PageID# 4503, 4505, Uhlig Depo. at 14:1-16:21, 22:2-23:9, 24:11-25:11; 34:5-35:112; *see also* R. 106-9, Richard Depo. at 162:1-164:6). In an email, she indicated that the Aetna Agreement "gives MMO best network rates outside of Ohio," noting also that "[t]he deal was good for [Aetna] International, but not for the enterprise." (R. 106-46, PageID# 4684, Exh. 163, AET_008985).

In addition, there is testimony that after the Agreements went into effect, Aetna's Head of Sales for North America proposed two other networks as alternatives to the Open Choice PPO network for MMO in 2019. (R. 129-7, PageID# 6090, Larkins Depo. at 126:20-127:20; 135:16-22). The trier of fact could reasonably infer that such alternatives would have been unnecessary

to propose if Aetna retained the ability to renegotiate the rates with providers for MMO alone.

The evidence cited in Part I-D-2 & 3 of this decision indicates that a number of providers were unhappy that MMO was receiving the benefit of Aetna's rates. Those providers indicated to Aetna that they were entitled to higher rates under their own agreements with Aetna, because they believed Aetna was renting their network to MMO. Aetna's internal correspondence indicates they were worried about losing providers and/or damaging important business relationships with the four carved-out providers. In some instances, Aetna just gave the providers the network rental rates, which were less favorable for MMO, despite the testimony of one of Aetna's negotiators that the Agreements did not constitute a rental network. (R. 129-19, PageID# 6851, Exh. 26, AET_014762). Again, a reasonable trier of fact could infer that Aetna deviated from its own understanding of its obligations to MMO under the Aetna Agreement to appease a number of important providers or to avoid litigation with those providers.

Finally, Aetna acknowledges that neither MMO nor AXA were party to the renegotiations concerning the reimbursement rates that applied solely to MMO's customers, and further, that Aetna did not notify MMO of the significant rate changes made with respect to the carved-out providers. (R. 104, PageID# 1714). Although Aetna presents evidence suggesting that it intended to notify MMO, it never did so. *Id*. A jury could reasonably infer that Aetna concealed the carved-out providers because it knew its actions breached the parties' general understanding of the Agreements' requirements.

Aetna's motion for summary judgment with respect to the breach of contract claim is denied. Summary judgment is not appropriate where an agreement is ambiguous and the extrinsic evidence presented to the Court is capable of supporting a contractual interpretation that conflicts with the moving party's interpretation. The above evidence, if credited by the jury,

supports an interpretation at odds with Aetna's assertion that the Aetna Agreement gave it *carte blanche* authority to renegotiate custom provider reimbursement rates applicable solely to MMO.[16]

**b. AXA's Request for Summary Judgment**

Turning to AXA's motion for summary judgment on its breach of contract crossclaim against Aetna, AXA takes a position with respect to the Aetna Agreement that is largely identical to MMO's position described above, at least with respect to the "its negotiated rates" language at the heart of the breach of contract claim. Specifically, AXA advances the position that Aetna breached the Aetna Agreement because it did not apply the same rates for MMO's customers as it did Aetna's own customers. (R. 106, PageID# 3448-3454). AXA recites much of the same evidence that Court identified above, in denying Aetna's motion for summary judgment, to support its argument that it is entitled to summary judgment.

However, when addressing AXA's motion for summary judgment, the Court must construe the evidence in the light most favorable to Aetna as the non-moving party. It is not this Court's role when faced with rival motions for summary judgment on the same claim to simply pick the side with the better argument or the side that has identified a more persuasive set of facts. As stated above, resolving an ambiguity in a contract is generally a fact question for the jury, and a court should not grant summary judgment unless the extrinsic evidence supports only

---

[16] Aetna posits that "the Aetna Agreement is clear that Aetna retained the sole authority to determine reimbursement rates in provider contracts." (R. 104, PageID# 1724, citing AE-2 §§ 4.16, 10.5). The Court does not construe any of MMO or AXA's briefs as challenging Aetna's ability to generally negotiate reimbursement rates with providers. Rather, they assert that the Aetna Agreement requires Aetna to apply those negotiated rates to MMO in the same manner as it does to Aetna's own Open Choice PPO customers. In other words, they challenge only Aetna's authority to engage in piecemeal renegotiations that apply only to MMO. Thus, Aetna's citation to these provisions of the Aetna Agreement do not carry the day.

one of the conflicting interpretations.

To be sure, the evidence supporting MMO and AXA's interpretation of the "its negotiated rates" language is considerable, and contemporaneous communications from Aetna, among other evidence, supports the position that the Aetna Agreement required Aetna to apply the same rates to MMO's customers, not a renegotiated custom rate. Nevertheless, Aetna has identified evidence that creates a genuine issue of material fact, thereby precluding summary judgment in AXA's favor.

As recounted above in Section I-A, MMO had conveyed to AXA that it wanted Aetna's "best rate or best discount," and Aetna responded by including language indicating the network utilized would be the one being used by a majority of the commercial and self-funded business. (R. 104-10, PageID# 2327-38, Nagle Depo. at 137:21–138:17; R. 104-30, AXA-4185). According to a declaration from Aetna's negotiator, which is admittedly a *post hoc* statement, the reimbursement rates that Aetna negotiates with providers varies over time, sometimes by service or provider, and even sometimes by payer. (R. 104-13, PageID# 2548, Remick Decl. at ¶7). Therefore, Aetna ostensibly "communicated to AXA's consultant that Aetna could not and would not agree to give MMO its 'best discounts' or any other particular reimbursement rate(s)." *Id*. The same individual from Aetna stated, again *post hoc*, that Aetna affirmatively struck "the reimbursement rates" language from the draft Letter of Understanding—the language that remained in the MMO Agreement—because Aetna was "unwilling to guarantee MMO anything about rates through the definition of Network." (R. 104-13, PageID# 2548-49, Remick Decl. at ¶8). If the finder of fact credits this testimony, it could create an inference that the "negotiated rates" language was not intended to convey that MMO would get the same rates as Aetna's

insureds despite being in the same network.[17]

Aetna has also pointed to MMO's pre-contractual proposal to include provider-specific discount guarantees for major providers like the University of Pittsburgh Medical Center ("UPMC") and University of Michigan (R. 104-28, PageID# 2925) as evidence that MMO knew it would not receive the same rates as Aetna's insureds, even in the same network. An AXA email to several MMO employees explained that "[w]e are unable to provide a guarantee for specific providers…." (R. 104-27, PageID# 2914; R. 129-16, PageID# 6830).[18]

According to MMO's Vice President of National Networks for MMO, the motivation behind regional "performance guarantees [was] MMO's protection against the financial terms of Aetna's contracts with providers changing in a manner to MMO's financial detriment." (R. 104-11, PageID# 2386, Depo. of Pirc at 74:14-20). The same MMO employee, Pirc, wrote in a March of 2016 email that "[t]he reason we want a separate Discount Guarantee around the border is that we think it is THESE area's [sic] that will push back on Aetna when they see we are paying less thru their network." (R. 104-25, PageID# 2905, MMO_061896). When asked whether "the pushback [Pirc was] referencing include[d] the possibility that the provider would amend its contract with Aetna in such a way that the discount MMO or its members would realize would become less favorable at that provider," Pirc responded: "Yes, which is why a discount guarantee

---

[17] Naturally, it remains up to the finder of fact as to how much weight, if any, is ascribed to the *post hoc* declaration of Aetna's negotiator, or to any of the testimony offered by the deponents identified herein when called as witnesses at trial.

[18] Again, the finder of fact could infer from this evidence that the "negotiated rates" language was not intended to convey that MMO would get the same rates as Aetna's insureds. Admittedly, an equally plausible inference is that Aetna was merely hesitant to agree to certain contractual language, because it could not guarantee that future reimbursements rates with providers would remain fixed. In other words, subsequent negotiated rates could have resulted in worse discounts for everyone in the Open Choice PPO network for a specific provider—not just worse rates for MMO.

was important." (R. 104-11, PageID# 2387, Depo. of Pirc at 79:15–79:23). It is true that this evidence can be viewed rather innocuously as MMO simply recognizing that Aetna's negotiated rates could go up for everyone in the Open Choice PPO network, thereby eroding MMO's benefit and allowing MMO to recoup some of that benefit shortfall through the performance guarantees. However, the evidence can also be construed as MMO acknowledging that the negotiates rates and reimbursement rates referenced in the Agreements could be changed solely with respect to MMO. The factual inferences that can be gleaned from this testimony, as well as its credibility, however, remain the province of the jury.

Finally, although AXA has moved for summary judgment on its breach of contract crossclaim arguing that the Aetna Agreement did not permit Aetna to renegotiate different rates with a provider just for MMO, one of AXA's negotiators, testified in his deposition that he was not aware of "any obstacle to Aetna agreeing with a provider to revise the rate such that MMO members would get a different rate than Aetna's insureds." (R. 129-4, PageID# 5689, Nagle Depo. at 116:5-9).

Construing the sampling of evidence cited directly above in the light most favorable to Aetna as the non-moving party, AXA's motion for summary judgment with respect to the breach of contract crossclaim is denied. The above evidence, would allow a reasonable jury to draw the conclusion that AXA and Aetna did not intend the "its negotiated rates" language in the Aetna Agreement to limit Aetna's ability to renegotiate a reimbursement rate with a provider that applied solely to MMO.

**B. Count Two: Tortious Interference with Contract against Aetna**

Defendant Aetna seeks summary judgment on this count, asserting that MMO has no evidence showing Aetna tortiously interfered with the agreement between AXA and MMO. (R.

104, PageID# 1728-29).

Under Ohio law, a claim for tortious interference with a contract requires a plaintiff to satisfy the following elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).

The first element is satisfied. As to the second element, it cannot in good faith be disputed that Aetna knew of the MMO Agreement between AXA and MMO, as there would have been no purpose to the agreement between Aetna and AXA otherwise. Aetna asserts it never actually saw the agreement, nor was it aware the MMO Agreement included in the definition of Network "the reimbursement rates" language. (R. 104, PageID# 1729). Aetna, however, cites no authority standing for the proposition that the second element requires the alleged wrongdoer to be aware of all the particulars and nuances of a contract. As discussed above, it remains an issue of fact whether the intent of the contracting parties was to provide MMO with the same negotiated rates as Aetna gave its other Open Choice PPO customers. Thus, it also remains an issue of fact as to whether Aetna intentionally procured the breach of the MMO agreement. Plaintiff has pointed to evidence, cited above by the Court in its recitation of facts, that Aetna employees wanted to end the agreement soon after it went into effect. (R. 129, PageID# 5393). Further, Aetna's undisclosed negotiation of special rates with certain providers that were disadvantageous to MMO's customers—the carve-out agreements—could reasonably be viewed by a finder of fact as intentional conduct designed to disrupt and breach the MMO agreement. Finally Aetna has not argued that the fourth and fifth elements are lacking. (R. 104, PageID# 1729).

Defendant Aetna raises new arguments and cites new authority in its reply brief with respect to this count. (R. 143, PageID# 7840). *Schneider v. Ct. of Common Pleas of Cuyahoga Cnty.*, No. 1:12 CV 778, 2012 WL 3485967, at *2 (N.D. Ohio Aug. 15, 2012) ("new arguments raised in a reply brief generally will not be entertained.") (citing *United States v. Corizer*, 259 F.3d 503, 517 (6th Cir. 2001)); *In re E. Palestine Train Derailment*, No. 4:23CV0242, 2025 WL 581003, at *6 (N.D. Ohio Feb. 21, 2025) ("Arguments raised for the first time in reply briefs, however, are typically waived.") The Court declines to address new arguments to which Plaintiff did not have an opportunity to respond.

Therefore, Defendant Aetna's motion is denied with respect to Count Two.

**C. Count Three: Tortious Interference with a Business Relationship against Aetna**

Defendant Aetna seeks summary judgment on this count, asserting that MMO, despite many months of discovery, including MMO's responses to Interrogatories, has not produced any evidence establishing (1) Aetna's intent to interfere with MMO's business relationships, (2) identified a single contract with a prospective client that it was unable to finalize, or (3) any business relationship with an existing client that was terminated or otherwise damaged because Aetna agreed to carved-out rates with the Four Providers. (R. 104, PageID# 1729-31).

> Under Ohio law, a claim for tortious interference with prospective business relations exists when: (1) a business relationship or contract existed; (2) the wrongdoer had knowledge of the relationship or contract; (3) the wrongdoer intentionally and improperly acted to "prevent a contract formation, procure a contractual breach, or terminate a business relationship"; (4) the wrongdoer has no privilege to act in this manner; and (5) damages resulted from wrongdoer's conduct. *Brookeside Ambulance v. Walker Ambulance Serv.*, 112 Ohio App.3d 150, 678 N.E.2d 248, 252 (Ohio Ct. App. 1996); *Barilla v. Patella*, 144 Ohio App.3d 524, 760 N.E.2d 898, 904 (Ohio Ct. App. 2001). The Ohio Supreme Court has enumerated factors that a court should consider in determining whether the alleged wrongdoer's actions were improper or privileged:
>
> > (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests

> of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Off. Depot, Inc. v. Impact Off. Prods., LLC*, 821 F. Supp. 2d 912, 924 (N.D. Ohio 2011) (*quoting Fred Siegel Co.*, 707 N.E.2d at 860).

The Sixth Circuit Court of Appeals has found that dismissal is proper where a plaintiff cannot identify a specific business relationship that has been harmed or a defendant's knowledge that its actions would harm a specific business relationship. *See Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020).

Plaintiff MMO's brief in opposition responds to Aetna's motion only so far as it seeks summary judgment with respect to the tortious interference of contract claim in Count Two, but is completely unresponsive with respect to the argument that there is no evidence of a tortious interference of a business relationship. (R. 129, PageID# 5392-93).

"[T]he burden on the moving party may be discharged by 'showing'—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Palmer v. Cacioppo*, 429 F. App'x 491, 500 (6th Cir. 2011) (citations omitted). Where a plaintiff fails to present or identify any evidence supporting its claim, summary judgment is properly granted. *Id.*; *see also Thompson v. Sunbeam Prods., Inc.*, 2011 WL 4502049, at *6 (S.D. Ohio Sep. 28, 2011) (noting that plaintiffs "do not address many of the arguments made by defendants and thus may be deemed to have conceded those claims"), *aff'd* 503 F. App'x 366 (6th Cir. 2012).

Therefore, the Court grants Aetna's motion for summary judgment with respect to Count Three.

**D. Counts Four and Five Unjust Enrichment and Promissory Estoppel**

Defendant Aetna has moved for summary judgment on Plaintiff's unjust enrichment and promissory estoppel claims, arguing that, under well-established Ohio law, "a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject." (R. 104, PageID# 1731, *quoting Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 858 (6th Cir. 2020)). In its brief in opposition, Plaintiff MMO expressly withdrew its alternative claims for unjust enrichment and promissory estoppel in light of Aetna's admission that MMO is a third-party beneficiary to the agreement between Aetna and AXA. (R. 129, PageID# 5394). Defendant AXA also moved for summary judgment on MMO's claims for unjust enrichment and promissory estoppel.

In its opposition brief to Aetna's motion for summary judgment, MMO stated that it "withdraws its alternative claims for Unjust Enrichment and Promissory Estoppel (Counts IV and V of the Complaint) in light of Aetna's admission that MMO is a third-party beneficiary of the Aetna MSA and is entitled to enforce the express contract." (R. 129, PageID# 5394). In its opposition brief to AXA's motion for summary judgment, Plaintiff MMO is silent as to these claims, despite AXA's request for summary judgment.

As Plaintiff appears to no longer be pursuing these causes of action against either Aetna or AXA, their respective motions for summary judgment are granted with respect to Counts Four and Five.

**E. AXA's Cross-Claim for Breach of Contract against Aetna**

Defendant Aetna has also moved for summary judgment with respect to Defendant AXA's single cross-claim against it for breach of contract. (R. 104, PageID# 1734-35). Because Defendant Aetna's motion is premised entirely on the same argument that it advanced in support

of its motion for summary judgment on Plaintiff MMO's breach of contract claim, an argument that the Court has already addressed and rejected *supra*, Aetna's request for summary judgment with respect to AXA's cross-claim is not well taken and is denied.

### F. Damages Post-Dating MMO's Termination of the Agreement

Defendant Aetna seeks summary judgment cutting off any damages post-dating December 31, 2022—the date MMO terminated its agreement with AXA, and indirectly Aetna. (R. 104, PageID# 1727-28). First, Aetna asserts that after said date it was no longer obliged to provide MMO access to the Open Choice PPO network or to reprice any MMO claims according to its provider contracts. *Id*. Second, Aetna contends that because MMO opted to terminate the contract and work with another insurer, Cigna, MMO cannot argue that anyone's conduct, except its own or Cigna's, caused overcharges on claims repriced by Cigna from 2023 onward. *Id*. MMO counters that such damages are recoverable under Ohio law as expectation damages. (R. 129, PageID# 5390-92). Generally, expectation damages are recoverable under Ohio law.

> Generally, Ohio law provides for three categories of damages for breach of contract: expectancy damages, reliance damages, and restitution damages. *Brads v. First Baptist Church of Germantown, Ohio*, 89 Ohio App.3d 328, 624 N.E.2d 737, 744–45 (Ohio Ct. App. 1993) (citing Restatement of the Law 2d, Contracts (1981), § 344)); *Brown Deer Restaurant, Inc. v. New Market Corp.*, No. 48910, 1985 WL 9802, at *4 (Ohio Ct. App. Mar. 28, 1985) (citing Restatement of the Law 2d, Contracts (1981), §§ 347, 349, 372)). **Expectancy damages are based on the aggrieved party's expectation interests and are intended to "give him the benefit of his bargain by putting him in the position he would have achieved if the contract had been performed"**; … "The aggrieved party can recover damages by only one of these measures since they accomplish inconsistent purposes." *Id*. (citing Restatement of the Law 2d, Contracts (1981), §§ 347, 349, 372); 12 Williston, Contracts § 1455 (Jaeger ed. 1970); *Yurchak v. Jack Boiman Constr. Co.*, 3 Ohio App.3d 15, 443 N.E.2d 526 (Ohio Ct. App. 1981)).

*Dominion Liquid Techs., LLC v. GT Beverage Co., LLC*, No. 1:11-CV-444, 2014 WL 1045913, at *7 (S.D. Ohio Mar. 14, 2014) (emphasis added); *Alternatives Unlimited-Special, Inc. v. Ohio*

*Dep't of Edn.*, 2013-Ohio-3890, ¶ 29, 2013 WL 4807016 (Ohio Ct. App. Sep. 10, 2013) ("a non-breaching party may recover a damage award that places it in the position it would have been had the contract been fully performed").

Nevertheless, as there has been no finding that a breach has occurred, the Court finds the issue regarding the extent of recoverable damages raised by Defendant Aetna's motion is premature. Therefore, the motion is denied without prejudice.

**G. Damages Cap in the MMO Agreement**

Section 11.7 of the MMO Agreement contains the following liability limits of AXA to MMO:

> Notwithstanding any other provision set forth herein, neither party shall be liable for any indirect, special, and/or consequential damages arising out of or in connection with this agreement. The total liability of claims manager in contract, tort (including negligence or breach of statutory duty) or otherwise arising in connection with this agreement will be **limited to five million dollars** provided, however, that the foregoing exculpation of liability shall not apply with respect to damages to the extent incurred as a result of such party's gross negligence, willful misconduct, breach of its confidentiality obligations or any disclosures or breaches covered under the business associate addendum. This section shall survive the termination of this agreement.

(R. 1-4, PageID# 55) (emphasis added).

In its motion for summary judgment, Defendant AXA raises a somewhat perfunctory one paragraph argument that MMO has no evidence that its alleged damages resulted from any of the exceptions set forth in Section 11.7—gross negligence, willful misconduct, breach of confidentiality obligations, improper disclosures or breaches covered under the Business Associate Addendum. (R. 106, PageID# 3459). Neither "gross negligence" nor "willful misconduct" are defined terms in the agreement between MMO and AXA.

Notably, AXA's own employees and/or consultants who negotiated the MMO agreement

stated that it was the parties' intention that the MMO Agreement and the Aetna Agreement be "mirrors" of each other. AXA's consultant Angelone testified that that he was surprised "the reimbursement rates in" language—language that Aetna has argued is a major distinction between the two contracts—was not in the Aetna Agreement. (R. 129-3, PageID# 5532, Angelone Depo. at 116:16-20). Section 10.5 of the MMO Agreement required AXA to "use its best efforts to have a valid executed agreement with Aetna, the owner or the Network within fifteen (15), business days after the effective date of this Agreement. Such agreement will allow Claims Manager to perform all required services pursuant to this Agreement and allows Company to access Network and providers." (R. 1-4, PageID# 53). AXA's general counsel testified that Section 10.5 required AXA to obtain access for MMO to Aetna's Network. (R. 129-6, PageID# 5954, George Depo. at 162:13-163:1). As stated above, the agreement AXA obtained did not contain "the reimbursement rates in" language, which Aetna believes to be a key difference and relieves Aetna of liability for breach of contract.

The Court has found that neither AXA nor Aetna are entitled to summary judgment on the breach of contract claim because disputed factual questions of contractual intent remain, which precludes summary resolution. The Court agrees with MMO's argument that, based on the facts developed, a jury could find that MMO and AXA both intended that MMO receive the same rates in the Open Choice PPO network that Aetna's other customers received. Nevertheless, a jury could also determine that such an intent was not included in the Aetna Agreement by AXA, and that AXA's conduct was grossly negligent as a result, or even willful misconduct, if AXA knew the Aetna Agreement varied materially from the MMO Agreement on a key component, but concealed the discrepancy in pursuit of a business opportunity.

In its reply brief, Defendant AXA greatly expands its argument and raises a number of

new arguments and cites new authority with respect to the damages cap. (R. 144, PageID# 7866-68). AXA argues that under Ohio law, any claim by MMO of gross negligence or willful or wanton misconduct by AXA must be based on a duty owed by AXA that is independent of the duties created by the contract. *Id*. at PageID# 7867. This argument was conspicuously absent from AXA's opening brief. As explained above, new arguments raised in a reply brief generally will not be entertained. The Court declines to address new arguments to which Plaintiff did not have an opportunity to respond.

For the foregoing reasons, the Court denies AXA's motion seeking a declaration that the $5,000,000 damages cap applies, as factual issues remain whether gross negligence or willful misconduct occurred.

### H. Aetna's Crossclaim against AXA

AXA's motion for summary judgment asserts that it is entitled to summary judgment on all three of Aetna's crossclaims, because AXA believes it is entitled to summary judgment on its own breach of contract crossclaim against Aetna. (R. 106, PageID# 3457). As discussed above, the Court denies AXA's motion for summary judgment on its crossclaim against Aetna for breach of contract. Because AXA's motion with respect to Aetna's crossclaims is entirely premised on a finding that Aetna was in breach, AXA's request for summary judgment in its favor on Aetna's crossclaims is not well taken and hereby denied.

## IV. Motions to Strike

On the same date Aetna filed its Motion for Summary Judgment, Aetna also filed a Motion to strike the reports of Plaintiff's expert Dennis S. Medica. (R. 96).[19] Aetna seeks an

[19] Aetna's objection centers on the expert's alleged use in his reports of a confidential settlement analysis prepared by Aetna in anticipation of mediation, which Aetna contends is subject to

order precluding him from testifying at any point in this proceeding against Aetna about the contents of those reports. *Id*. at PageID# 1511. A day after AXA filed its Memorandum in Opposition to Defendant Aetna's Motion for Summary Judgment, AXA filed a Motion to Strike Certain Exhibits to Aetna Life Insurance Company's Summary Judgment Motion. (R. 120). Specifically, AXA seeks to strike "Exhibits AE-17 (opening report of Aetna's expert Gregory Russo), AE-18 (opening report of Aetna's expert Michael Salve), AE-19 (rebuttal report of Aetna's expert Gregory Russo), AE-20 (rebuttal report of Aetna's expert Michael Salve), and AE-60 (Aetna's responses and objections to AXA's third set of interrogatories." *Id*. at PageID# 5276.

The Court has not considered any of the above reports or materials in this Memorandum Opinion and Order. Therefore, both motions (R. 96 & 120) are hereby denied as moot. Furthermore, to the extent they seek to prevent certain materials from being referenced at trial, the filings are woefully premature.

**V. Conclusion**

For the foregoing reasons, Defendant Aetna's Motion for Summary Judgment (R. 94) is hereby GRANTED in part and DENIED in part. Specifically, summary judgment is granted in Aetna's favor with respect to Plaintiff's Counts Three, Four and Five, which are hereby dismissed, but denied in all other respects. Aetna's motion for summary judgment with respect to AXA's crossclaim for breach of contract is also denied. Defendant AXA's Motion for Summary Judgment (R. 98) is GRANTED in part and DENIED in part. Specifically, summary judgment is granted in AXA's favor with respect to Plaintiff's Counts Four and Five, which are dismissed,

---

Federal Rule 408. (R. 96).

but denied in all other respects. Finally, the two motions to strike (R. 96 & 120) are DENIED as moot and premature.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States District Judge

Date: September 29, 2026